Paul Carlos Southwick (ISB No. 12439)
Emily Myrei Croston (ISB No. 12389)
ACLU of Idaho Foundation
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
psouthwick@acluidaho.org
ecroston@acluidaho.org

Malita Picasso*
Chase B. Strangio*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
cstrangio@aclu.org
mpicasso@aclu.org

*Motion for *pro hac vice* forthcoming

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **JANE ROE, JANE POE, JANE DOE**, <br><br> *Plaintiffs*, <br><br> v. <br><br> **RAÚL LABRADOR**, in his official capacity as Attorney General of the State of Idaho; **BRAD LITTLE,** in his official capacity as Governor of the State of Idaho, **JOSH TEWALT** in his official capacity as the Director of the Idaho Department of Corrections; **BREE DERRICK** in her official capacity as the Deputy Director of IDOC; **Centurion of Idaho, LLC**; **Centurion Health**, <br><br> *Defendants*. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs Jane Roe, Jane Poe and Jane Doe ("Plaintiffs")[1], by and through their attorneys, bring this action on their own behalf and on behalf of a class of those similarly situated pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure, and allege as follows:

## INTRODUCTION

1.      Plaintiffs and the putative class they seek to represent are people currently incarcerated in the custody of the Idaho Department of Corrections ("IDOC"). Plaintiffs have all been diagnosed with gender dysphoria, a serious medical condition characterized by clinically significant distress resulting from the incongruence between a person's gender identity and sex designated at birth. Plaintiffs, and those similarly situated to them, face the imminent loss of their health care because Idaho state law mandates an across-the-board ban on their necessary medical treatment.

2.      IDOC recognizes gender dysphoria as a serious medical need.

3.      For years, IDOC has had a formal internal directive governing the treatment of gender dysphoria, which anticipates treatment with hormone therapy based on individual medical need.

4.      Plaintiffs have all been prescribed and are provided hormone replacement therapy to treat their diagnosed gender dysphoria by a clinician acting on behalf of IDOC, Centurion Health, and Centurion Idaho, LLC ("Centurion").

5.      Plaintiffs' gender dysphoria has improved because of their hormone therapy, and they have experienced no adverse side effects warranting a change or discontinuation in their treatment plans for medical reasons.

---

[1] Plaintiffs will file motion for leave to proceed pseudonymously.

6.      As a result of House Bill 668 ("HB 668"), medical staff employed by IDOC and/or Centurion have notified some Plaintiffs that their hormone replacement therapy will be terminated or their dose will be lowered in preparation for HB 668's effective date of July 1, 2024.

7.      Upon information and belief, at the direction of Defendants, Plaintiffs, and those similarly situated, will have all hormone therapy to treat gender dysphoria terminated beginning July 1, 2024 because of HB 668.

8.      IDOC contracts with Centurion to provide medical care for prisoners in state custody.

9.      IDOC is responsible for ensuring that medical care is provided to incarcerated individuals in accordance with constitutional standards.

10.      Defendants' withdrawal, denial, and/or reduction of medications prescribed to treat plaintiffs' serious medical needs based on a blanket ban and without any individualized medical determination, violates the Eighth Amendment to the U.S. Constitution's prohibition on cruel and unusual punishment.

11.      Plaintiffs seek injunctive and declaratory relief to remediate Defendants' violations of their rights and preserve their access to their gender-affirming medical care.

## JURISDICTION AND VENUE

12.      Plaintiffs bring this suit pursuant to 42 U.S.C. § 1983 and the Eighth Amendment to the U.S. Constitution. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1341. Plaintiffs seek declaratory and injunctive relief for Defendants' violation of Plaintiffs' civil rights.

13.     Venue is appropriate in the District of Idaho pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the claim occurred in this District.

## PARTIES

### I.     Class of Incarcerated Persons

14.     Plaintiffs bring this action on their own behalf and on behalf of a class of those similarly situated pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

15.     The class is defined as: all incarcerated persons in the custody of IDOC who are, or will be, diagnosed with gender dysphoria, and are receiving, or would receive, hormone therapy proscribed by H.B. 668.

16.     As defined, the class meets all the requirements of Rule 23(a).

17.     The class is so numerous that joinder of all members is impracticable. At least 37 incarcerated people from three IDOC facilities will, as a result of H.B. 668, lose access to hormone therapy as of July 1, 2024. An additional 17 incarcerated people from two IDOC facilities have started the process, or intend to start the process, of qualifying for hormone therapy, but will be unable to continue the process as of July 1, 2024.

18.     IDOC operates an additional six facilities. Additional class members are likely to be incarcerated in those facilities.

19.     Additional class members will become incarcerated in the custody of IDOC in the future. They will not receive gender-affirming medical care even if they have a diagnosis of gender dysphoria and a recognized need for this care. Regardless of need, treatment will be denied because of Defendants' enforcement of the blanket ban on treatment in H.B. 668.

20.     There are questions of law or fact common to the class. If Defendants are permitted to enforce H.B. 668, all members of the class will be subject to a common harm: the cessation of their gender-affirming medical care and/or inability to obtain gender-affirming medical care that is necessary to treat their gender dysphoria. All members seek the same relief: an injunction preventing enforcement of H.B. 668, as applied to incarcerated people in IDOC custody. This lawsuit also presents common questions of law, including whether Defendants' enforcement of H.B. 668 violates the Eighth Amendment's protections against cruel and unusual punishment.

21.     Plaintiffs' claims are typical of those of the class. They are all transgender incarcerated persons who have been diagnosed by IDOC with gender dysphoria and who Defendants are providing, and would continue to provide, gender-affirming medical care if it were not prohibited by H.B. 668.

22.     Plaintiffs are adequate representatives of the class. They do not have conflicts with other members of the class, they seek the same relief as other members of the class, and they will represent the class fairly and adequately.

23.     The class representatives are also adequately represented by counsel. Counsel includes the American Civil Liberties Union Foundation and the American Civil Liberties Union Foundation of Idaho. Counsel have extensive experience litigating class actions in federal court, including civil rights lawsuits on behalf of transgender persons and incarcerated persons.

24.     The requirements of Rule 23(b)(2) are met in that Defendants have acted, or will act, on grounds generally applicable to the class, and final injunctive relief and corresponding declaratory relief are appropriate respecting the class as a whole. Medical staff employed by IDOC and/or Centurion have notified the Plaintiffs that their hormone replacement therapy will

be immediately discontinued, or reduced and ultimately discontinued, on or before HB 668's effective date. The Attorney General of the State of Idaho has authority to bring legal action to enforce H.B. 668. *See* H.B. 668 § 2(7); Idaho Code § 67-1401(7).  IDOC and the other Defendants will similarly enforce and/or follow H.B. 668's blanket prohibition on gender-affirming medical care at IDOC facilities.

II.     **Named Plaintiffs**

25.     *Plaintiff Jane Roe* a transgender woman currently incarcerated at ISCC. She has been incarcerated since 2014 and anticipates being incarcerated until March of 2033.

26.     Ms. Roe arrived in an IDOC facility, ISCI, for the first time in 2014.

27.     Beginning at a very young age Ms. Roe began to recognize herself and identify as a girl. She has gone by her typically female name since she was 12 or 13 years old. While she was still in the Reception and Diagnostic Unit at intake to ISCI, an IDOC clinician, or clinician contracted by IDOC, who specialized in gender dysphoria told her that she could be formally evaluated for gender dysphoria.

28.     Ms. Roe was diagnosed by this clinician and her diagnosis of gender dysphoria was approved by IDOC.

29.     Ms. Roe has presented in a typically feminine manner while in IDOC custody.

30.     IDOC and/or Centurion or those under their direct control have prescribed hormone therapy to treat Ms. Roe's gender dysphoria since 2015. Since 2017, when she was moved to ISCC, she has been under the care of another doctor acting on behalf of IDOC and/or Centurion whom she sees about once a year.

31.     Ms. Roe has her blood work taken about every 90 days to check her hormone levels. She currently receives estradiol (estrogen therapy) and spironolactone, which blocks male sex hormone receptors to lower the amount of testosterone the body makes.

32.     Ms. Roe's hormone therapy has given her hope for a better life and a better future. It has reduced her clinical symptoms of gender dysphoria.

33.     Hormone therapy has greatly improved Ms. Roe's health and well-being.

34.     Ms. Roe first learned that HB 668 may affect her gender affirming medical care when she saw a couple of legislators discussing it on KTVB News. It is her understanding that because of this new law, she will be cut off from her hormone replacement therapy on or about July 1, 2024.

35.     Ms. Roe has been told by medical staff within the prison that they will not be able to provide her with any medical treatment for her gender dysphoria beginning on July 1, 2024.

36.     Staff employed by Defendants administer Ms. Roe's hormone therapy orally twice a day (morning and evening).

37.     If she is cut off from her medication it would be emotionally and physically devastating for Ms. Roe. Her body would experience extreme hormone dysregulation, she will have psychological effects from her hormone imbalance, and will experience irreparable damage to the feminization she has been able to achieve after being on hormone therapy for a decade.

38.     Losing the effects of hormone therapy will cause Jane Roe severe and irreparable harm.

39.     Plaintiff Roe is familiar with at least nine other people who are treated with gender-affirming hormone therapy for gender dysphoria in ISCC alone. She is also familiar with

an additional at least fourteen people who have been diagnosed with gender dysphoria and are awaiting treatment or are awaiting assessment for a diagnosis of gender dysphoria.

40.     *Plaintiff Jane Poe* is a transgender woman.

41.     Ms. Poe is currently incarcerated at ISCI. She has been incarcerated since April of 2023 and anticipates being incarcerated until 2025.

42.     Ms. Poe has identified as a woman since she was 23 years old, and has lived as a woman since 2017.

43.     When she was arrested in 2019, Ms. Poe was sent to North Idaho Correctional Institution ("NICI"). While there, she asked to be evaluated for gender dysphoria. She was diagnosed with gender dysphoria by a physician at the facility.

44.     Ms. Poe began hormone therapy that year and has taken it for the past five years. She currently takes Estradiol and Spironolactone. She receives blood work every six months and meets with her doctor yearly to monitor the hormone therapy.

45.     On May 28, 2024, she learned about H.B. 668 and its potential impact on her medication. It is her understanding that because of this new law, she will be cut off from her medical treatment on or about July 1st of this year.

46.     On June 13, 2024, Ms. Poe was told by members of the medical staff that she would be tapered off her hormone therapy medications beginning July 1, 2024. The same day, a memo was sent to her and, she believes, another 15 transgender people at ISCI who use hormone replacement therapy, asking them to gather for a meeting the following week to discuss the changes in ISCI's ability to provide gender affirming medical care.

47.     At the June 20, 2024 meeting, the Warden, Head of Security, and Head of Medical told the transgender people that, due to HB 668, they would either be cut off or tapered off their hormone therapy.

48.     Ms. Poe is concerned for how this will impact her. Before she was incarcerated in 2023, she suffered a lapse in her hormone therapy due to not having a means of transportation. During that time, she was mentally unstable. Ms. Poe suffered increased anxiety and depression. Her body went through male puberty again and her dysphoria increased. She found it hard to sleep. While the changes in her body upon starting hormone therapy were gradual, after temporarily stopping, the changes came much more quickly and she felt mentally and physically exhausted. She felt alternately cold, clammy, and hot and suffered pain and depression.

49.     IDOC staff administer Ms. Poe's hormone therapy orally twice a day (morning and evening).

50.     She does not want to suffer this again. If she is cut off on July 1, she would be scared for herself. She fears she would suffer the same suicidality and severe mental pain and suffering as she did before.

51.     *Plaintiff Jane Doe* is a transgender woman.

52.     Ms. Doe is currently incarcerated at ISCI. She has been incarcerated since 2023, and anticipates being incarcerated in Idaho for several more years.

53.     In 2020, before Ms. Doe was incarcerated, her general care physician diagnosed her with gender dysphoria.

54.     Ms. Doe began gender affirming hormone therapy, in the form of intramuscular injections of Estradiol and Spironolactone, shortly thereafter. She received this therapy for three years before her incarceration in IDOC.

55.     After starting the hormone therapy, Ms. Doe finally started feeling like herself. Her anxiety decreased. She was finally able to hold a job. She got her first apartment. Her quality of life drastically improved.

56.     When Ms. Doe was first arrested in 2023, she was not provided hormone therapy in county jail. During that time Ms. Doe's breast tissue reduced, her testicles descended again, and she experienced intense dysphoria. During this time, she checked her appearance in the mirror obsessively, so much so that it became exhausting for her. She had difficulty sleeping at this time.

57.     It is Ms. Doe's understanding that IDOC requires her to be diagnosed with gender dysphoria by one of their physicians before restarting hormone therapy in prison. Once Ms. Doe was moved to an IDOC facility, a doctor visited her in the Reception and Diagnostic Unit. He discussed her gender dysphoria diagnosis with her and told her he would write a report on her condition to be approved by the Management and Treatment Committee, after which Ms. Doe could receive her hormone therapy in the facility.

58.     One to two months later, Ms. Doe received word that the Committee had approved her gender dysphoria diagnosis. The facility clinicians scheduled and performed a blood test and Ms. Doe was scheduled to meet with a doctor for the prescription on her hormone therapy medications.

59.     Ms. Doe met with her doctor one month later and was prescribed Estradiol and Spironolactone. Ms. Doe was able to begin to receive these prescriptions one week later. Ms. Doe has now been back on those medications for three months.

60.     Immediately upon restarting her hormone therapy, Ms. Doe's dysphoria decreased.

61.     IDOC staff administer Ms. Doe's hormone therapy orally twice a day (morning and evening).

62.     On May 28, 2024, Ms. Doe learned about HB 668 and its potential impact on her medication. It is Ms. Doe's understanding that, because of this new law, she will be cut off from her medical treatment on or about July 1, 2024.

63.     On June 13, 2024, ISCI's Clinician told Ms. Doe that she would be either cut off or tapered off her hormone therapy medications beginning July 1, 2024. The same day a memo was sent to Ms. Doe and the other transgender people at ISCI who receive hormone replacement therapy in the facility, asking everyone to gather for a meeting the following week to discuss the changes in ISCI's ability to provide gender affirming medical care.

64.     At the June 20, 2024 meeting, the Warden, Head of Security, and Head of Medical told the transgender people that, due to HB 668, they would be either cut off or tapered off their hormone therapy.

65.     Ms. Doe is aware of at least eleven other transgender people currently on hormone therapy, and three others in the process of obtaining hormone therapy, at ISCI.

66.     Ms. Doe is concerned about how this will impact her. If she is not able to continue her prescribed hormone replacement therapy, she fears her gender dysphoria and subsequent depression will get worse.

### III.    **Defendants**

67.     Defendant RAÚL LABRADOR is the Attorney General of the State of Idaho. Idaho law grants Defendant Labrador authority to bring legal action to enforce H.B. 668. *See* H.B. 668 § 2(7); Idaho Code § 67-1401(7). Defendant Labrador is sued in his official capacity.

68.     Defendant BRAD LITTLE is the Governor of the State of Idaho. Governor Brad Little signed HB 668 into law on March 27, 2024. Section 5 of the Idaho Constitution vests the governor with "supreme executive power" and tasks the governor with responsibility for ensuring all State laws are faithfully executed. Defendant Little is sued in his official capacity.

69.     Defendant JOSH TEWALT is the current Director of IDOC. IDOC is the State agency responsible for incarceration of adult inmates sentenced by the courts. IDOC operates nine adult correctional facilities in Idaho, including Idaho State Correctional Center ("ISCC"), Idaho State Correctional Institution ("ICSI") and Pocatello Women's Correctional Center ("PWCC") where Plaintiffs are housed. As Director, Defendant Tewalt is the highest-level official in IDOC and is responsible for administering and overseeing the operations of IDOC, including the policies, procedures, and practices followed by IDOC, its contractors, employees, and agents. On information and belief, Defendant Tewalt is also the final reviewer for treatment decisions by IDOC's Management and Treatment Committee. Defendant Tewalt is sued in his official capacity.

70.     Defendant BREE DERRICK is the current Deputy Director of IDOC. As Deputy Director, Defendant Derrick is a member of IDOC's executive leadership team and is specifically charged by IDOC policy with overseeing implementation of health care services and treatment in IDOC including the development and implementation of standard operating procedures to effectuate health care delivery. *See* Board of Correction IDAPA Rule Number 401. Defendant Derrick is sued in her official capacity.

71.     On information and belief, Defendant Centurion of Idaho, LLC is a private limited liability company organized under the laws of Idaho that is contracted to provide healthcare, including medical and mental health treatment services, to inmates in the custody of

IDOC, including Plaintiffs. As IDOC's contract medical provider, Centurion is responsible for ensuring that proper medical, dental, psychiatric, and psychological services, and treatment are provided to inmates incarcerated under IDOC's jurisdiction.

72.     Defendant Centurion Health is a private corporation headquartered in Virginia and is contracted to provide healthcare, including medical and mental health treatment services, to inmates in the custody of IDOC, including Plaintiffs. As IDOC's contract medical provider, Centurion is responsible for ensuring that proper medical, dental, psychiatric, and psychological services, and treatment are provided to inmates incarcerated under IDOC's jurisdiction.

73.     At all times relevant herein, each Defendant was acting in the course and scope of his or her employment and under color of state law.

## FACTUAL ALLEGATIONS

### Gender Dysphoria is a Serious Medical Condition Requiring Treatment

74.     "Gender Identity" is a person's internal sense of belonging to a particular gender.

75.     "Gender dysphoria" is the diagnosis for the clinically significant distress that can result from the incongruity between one's gender identity and the sex they were designated at birth. It is a treatable condition recognized by the American Psychiatric Association and included in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, as well as the International Classification of Diseases-10 (World Health Organization).

76.     Without treatment, the clinically significant distress caused by gender dysphoria can impair one's ability to function in everyday life.

77.     Gender dysphoria is highly treatable and with appropriate treatment, individuals can fully manage the symptoms of their gender dysphoria. When not properly treated, however,

gender dysphoria is often associated with dangerous related conditions such as depression, substance abuse, self-mutilation, suicidal ideation, and suicide.

78.     The World Professional Association for Transgender Health ("WPATH") is the leading international organization focused on transgender health care. WPATH has 4,500 members throughout the world including physicians, psychiatrists, psychologists, social workers, surgeons, and other health professionals who specialize in the diagnosis and treatment of gender dysphoria. WPATH publishes the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("Standards of Care" or "SOC"), which were first developed in 1979. The current version of the Standards of Care, Version 8, was published in September 2022. WPATH's Standards of Care provide clinical guidance to mental health providers and medical professionals treating gender dysphoria

79.     Prior to the implementation of HB 668 by Defendants, Plaintiffs received  gender affirming medical care treatment from an endocrinologist contracted through Centurion in accordance with medical protocols, including the WPATH Standards of Care.

<u>Treatment for Gender Dysphoria</u>

80.     The WPATH Standards of Care recommend the following treatments depending on the individual needs of the patient: (1) Social transition, which may involve changes to gender expression, including adopting a different name, pronoun, external presentation; (2) Hormone therapy to feminize or masculinize the body; (3) Surgery to change primary and/or secondary sex characteristics; and (4) Psychotherapy (individual, couple, family, or group) for (a) exploring gender identity, role, and expression; (b) addressing the negative impact of gender dysphoria and stigma on mental health; (c) alleviating internalized transphobia; (d) enhancing social and peer support; (e) improving body image; or (f) promoting resilience.

81.     Once a diagnosis of gender dysphoria is made, a treatment plan is developed by a competent medical provider based on the individual needs of the patient.

82.     For almost all people with persistent and well-documented gender dysphoria, hormone therapy is an essential and medically necessary treatment to alleviate the intractable distress caused by the condition.

83.     The goals of hormone therapy for people with gender dysphoria are: (i) to significantly reduce hormone production associated with the person's sex assigned at birth and, thereby, the secondary sex characteristics of the individual's sex assigned at birth; and (ii) to replace circulating sex hormones associated with the person's sex assigned at birth with feminizing or masculinizing hormones, using the principles of hormone replacement treatment developed for hypogonadal patients (i.e., non-transgender males born with insufficient testosterone or non-transgender females born with insufficient estrogen).

84.     The therapeutic effects of hormone therapy are twofold: (i) with endocrine treatment, the patient acquires congruent sex characteristics; and (ii) hormones act directly on the brain, via receptor sites for sex steroids, which produces an attenuation of dysphoria and attendant psychiatric symptoms, and the promotion of a sense of well-being.

85.     For transgender women who have undergone orchiectomy (surgical removal of the testicles), hormone therapy must be maintained at therapeutic levels to avoid additional adverse health effects.

86.     The safety and efficacy of hormone therapy to treat gender dysphoria are well-documented in decades of research and clinical experience.

87.     Psychotherapy and psychotropic medications are not a substitute for hormone therapy to treat gender dysphoria.

<u>Incarcerated People with Gender Dysphoria are Entitled to Access Medically Necessary
Treatment for their Dysphoria, Including Hormone Therapy</u>

88.     It is the policy of IDOC and its contractors to provide "proper medical, dental,

psychiatric and psychological services, and treatment" to incarcerated persons. IDOC Policy 401.

89.     IDOC recognizes that hormone therapy is necessary medical treatment for some

people. Under IDOC's Gender Dysphoria Policy, 401.06.03.501, "Hormone replacement therapy

will be provided as needed, but only when medically indicated and consistent with the inmate's

treatment plan. An inmate who was receiving hormone replacement therapy at the time of

incarceration will continue on those medications, unless current treating medical providers

determine there is a medically compelling reason to discontinue treatment."

90.     Consistent with IDOC policy, prior to HB 668 hormone dosing to treat gender

dysphoria was based on medical need.

91.     The clinical guidelines outlined in the WPATH Standards of Care apply to

institutional settings, including prisons. Institutionalized persons on appropriate gender-affirming

hormone therapy should be continued on such therapies and monitored, according to the

Standards of Care. Denying medical care to treat gender dysphoria in prisoners with a known

need for that care causes severe and expected harms including worsening symptoms of gender

dysphoria, anxiety, suicidality, and acts of self-injury.

92.     Withdrawing hormone therapy from people who rely on that therapy to treat

gender dysphoria causes severe mental distress as well as immediate physical side effects.

93.     Abruptly withdrawing hormone therapy can lead to headaches, hot flashes, and

even heart attack or stroke due to spikes in blood pressure.

<u>The Idaho State Legislature Passed H.B.668</u>

16

94.     In March 2024, the Idaho State Legislature passed HB 668, prohibiting the use of public funds or public facilities to provide gender-affirming hormone therapy "for purposes of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex." H.B. 668 §§ 2, 5-6. Governor Brad Little signed HB 668 into law on March 27, 2024.

95.     Upon information and belief, IDOC policy, which has been in place for over twenty years, has provided coverage for the gender-affirming medical care now prohibited by H.B. 668. Consequently, H.B. 668 upended a policy that has been in place and relied upon by incarcerated people for over twenty years.

96.     Not only does H.B. 668 categorically prohibit the use of public funds to provide any gender-affirming medical care, regardless of the individual needs of the patient, it also criminalizes the provision of gender-affirming care.  Intentional violations of H.B. 668 by public officers or public employees are considered a misuse of public monies, a crime punishable by a fine of up to $10,000 and imprisonment of not less than one year nor more than fourteen years. I.C. 18-5702 § 3. Therefore, any IDOC employee, Centurion employee working as an agent of IDOC, or any other health care specialist or professional contracted with IDOC or Centurion, who in any way provides gender-affirming medical care is subject to prosecution by Defendant Labrador.

97.     H.B. 668 is part of a slew of laws enacted in Idaho over the past few years that intentionally limit legal protections and rights for the state's transgender community. *See e.g.* HB 71 (criminalizing gender-affirming medical care as to transgender youth); HB 421 (erasing transgender individuals from recognition in all state laws, policies and regulations by restricting the terms sex and gender to mean only sex assigned at birth); SB 1100 (restricting access to

school facilities); HB 668 prohibiting public funds for gender-affirming medical care as to Medicaid recipients (in addition to incarcerated people).

98.     On June 3, 2024, counsel for Plaintiffs sent a demand letter to counsel for IDOC and Centurion, and to the Idaho Attorney General's Office, explaining that enforcing HB 668 in state prisons would violate the Eighth Amendment rights of prisoners in IDOC custody and requesting information about the enforcement of HB 668 and its potential immediate impact on individuals in the custody of IDOC who currently rely on hormone therapy to treat diagnosed gender dysphoria. Counsel for Plaintiffs warned counsel for these Defendants of the grave consequences incarcerated individuals would experience as a result of HB 668's enforcement.

99.     IDOC replied on June 10, 2024 that the agency was discussing the possible impact of HB 668 on individuals in its custody and control but had not decided how HB 668 would be implemented at IDOC facilities.

100.     On June 17, counsel for Plaintiffs sent the Attorney General's Office and counsel for Centurion a correspondence requesting a short-term non-enforcement agreement to prevent immediate harm to incarcerated individuals.

101.     On June 21, counsel for the parties participated in a video call to discuss a potential non-enforcement agreement. On June 26, the Attorney General's office and counsel for Centurion informed counsel for Plaintiffs that they would not agree to a period of non-enforcement and that enforcement would begin on July 1, 2024.

## CLAIM FOR RELIEF

### Denial of Necessary Medical Treatment (8th Amendment; 42 U.S.C. § 1983)

*Against ALL Defendants*

102.    Plaintiffs repeat and reallege the allegations in all preceding paragraphs as if fully set forth herein.

103.    Plaintiffs have been diagnosed with the serious medical condition of gender dysphoria, which continues to cause Plaintiffs serious clinical distress and, which, without necessary treatment, will predictably result in serious and irreparable physical and psychological harm to Plaintiffs.

104.    Plaintiffs have been prescribed hormone therapy to treat their gender dysphoria while incarcerated. That hormone therapy has relived their symptoms of gender dysphoria.

105.    Defendants are responsible for providing adequate and necessary medical treatment to Plaintiffs, including treatment for persons diagnosed with gender dysphoria.

106.    HB 668, which the Attorney General's Office and IDOC have announced they will enforce at IDOC facilities, establishes a blanket prohibition that denies necessary medical treatment to Plaintiffs and all other similarly situated prisoners in IDOC facilities without consideration of any individualized medical judgment formed by health care providers, and therefore violates the Eighth Amendment's prohibition on cruel and unusual punishments.

107.    Because of the pending effective date of HB 668, Defendants will discontinue, or reduce until discontinued, Plaintiffs' medication.

108.    By enforcing HB 668 as applied to Plaintiffs and thereby denying them medical treatment for their gender dysphoria, Defendants will cause Plaintiffs harm by withholding effective treatment for an objectively serious medical condition.

109.    Defendants' deliberate actions of denying, reducing and cutting off needed medical treatment for Plaintiffs has caused or will cause them severe physical and psychological harm and puts them at grave risk for worsening physical and psychological symptoms.

19

110.    Defendants have acted, and continued to act, with deliberate indifference to Plaintiffs' serious medical needs, and to the substantial risk of serious harm to Plaintiffs.

111.    As a result of Defendants' actions described herein, Plaintiffs will imminently suffer, and in the absence of injunctive relief, will continue to suffer irreparable physical and psychological harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgement in their favor and against Defendants as follows:

a. For preliminary and permanent injunctive and declaratory relief, including but not limited to enjoining Defendants, including their contractors, employees, and agents, from enforcing H.B. 668 as applied to Plaintiffs and Class members incarcerated in the custody and control of IDOC; enjoining Defendants, their contractors, employees, and agents, to provide and continue providing Plaintiffs and Class members gender-affirming hormone therapy, in accordance with nationally recognized standards for delivery of such care; and declaring unconstitutional Defendants' practices in denying Plaintiffs and Class Members adequate and necessary medical treatment;

b. Provisional and permanent certification of the Class;

c. For reasonable costs of this suit and attorneys' fees and expenses; and

d. For such further relief as the Court may deem just, proper, and appropriate.

///

June 28, 2024

Respectfully submitted,

/s/ Paul Carlos Southwick

Attorney for Plaintiffs