Paul Carlos Southwick (ISB No. 12439)
Emily Myrei Croston (ISB No. 12389)
ACLU of Idaho Foundation
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
psouthwick@acluidaho.org
ecroston@acluidaho.org

Chase B. Strangio*
Malita Picasso*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
cstrangio@aclu.org
mpicasso@aclu.org

*Motion for admission *pro hac vice* forthcoming

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **JANE ROE, JANE POE, JANE DOE**, <br><br> *Plaintiffs*, <br><br> v. <br><br> **RAÚL LABRADOR**, et al., <br><br> *Defendants*. | Case No. 1:24-cv-00306-CWD <br><br> **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER, PROVISIONAL CLASS CERTIFICATION AND PRELIMINARY INJUNCTION** |

**INTRODUCTION**

This case concerns the serious pain, anguish, and catastrophic health consequences that will be caused by the imminent denial of needed gender-affirming medical care ("GAMC") to Plaintiffs and other similarly situated transgender individuals incarcerated in Idaho state prisons. The Idaho Attorney General, the Governor, the Director of the Idaho Department of Corrections, Centurion and other named defendants and their agents are aware of these harms but nonetheless intend to enforce H.B. 668, Idaho's recently enacted blanket ban on the use of public funds and public facilities to treat gender dysphoria with the only evidence based medical intervention available. Such enforcement will violate the Eighth Amendment rights of incarcerated transgender individuals unless this Court immediately intervenes. Counsel for Plaintiffs notified Defendants of these concerns well in advance of the statute's effective date and attempted to negotiate a short-term non-enforcement agreement with Defendants to prevent the need for this motion. On June 26, Defendants declined such an agreement despite repeatedly being informed of the harms that would flow to Plaintiffs by enforcing this law against transgender prisoners with gender dysphoria. Plaintiffs seek emergency relief to maintain the status quo, their health, and their chances of survival.

**FACTUAL BACKGROUND**

**I.    PLAINTIFFS**

*Plaintiff Jane Roe* a transgender woman currently incarcerated at ISCC.[1] Ms. Roe has been incarcerated in IDOC since 2014 and anticipates being incarcerated until March of 2033. Beginning at a very young age Ms. Roe began to recognize herself as a girl. She has gone by her typically female name since she was 12 or 13 years old. While she was still in the Reception and

---

[1] The following facts relating to Ms. Roe are contained in her Declaration in support of this Motion.

Diagnostic Unit at intake to ISCI, an IDOC or IDOC contracted clinician who specialized in gender dysphoria told her that she could be formally evaluated for gender dysphoria. Ms. Roe's diagnosis of gender dysphoria was approved by IDOC. Ms. Roe has presented in a typically feminine manner while in IDOC custody.

Defendants or those under their direct control have prescribed hormone therapy to treat Ms. Roe's gender dysphoria since 2015. She is currently treated with gender-affirming hormone therapy to prevent the development of typically male secondary sex characteristics, to feminize her appearance and to mitigate the severe distress of her gender dysphoria.

Hormone therapy has greatly improved Ms. Roe's health and well-being. But because of HB668, Ms. Roe has been told by medical staff within the prison that they will not be able to provide her with any medical treatment for her gender dysphoria beginning on July 1, 2024. If she is cut off from her medication it would be emotionally and physically devastating for Ms. Roe. Her body would experience extreme hormone dysregulation, she will have psychological effects from her hormone imbalance, and will experience irreparable damage to the feminization she has been able to achieve after being on hormone therapy for a decade. Losing the effects of hormone therapy will cause Jane Roe severe and irreparable harm. She is also familiar with at least nine other people who are treated with gender-affirming hormone therapy for gender dysphoria in ISCC alone. And another fourteen people who have been diagnosed with gender dysphoria and are awaiting treatment or are awaiting assessment for a diagnosis of gender dysphoria.

*Plaintiff Jane Poe* is a transgender woman.[2] She has lived and identified as a woman for many years. Ms. Poe is currently incarcerated at ISCI since April of 2023. She anticipates being incarcerated until 2025. Ms. Poe was previously incarcerated in 2019 at North Idaho Correctional

---

[2] The following facts relating to Ms. Poe are contained in her Declaration in support of this Motion.

Institution ("NICI"), an IDOC facility. While at NICI, she asked to be evaluated for gender dysphoria and was diagnosed with gender dysphoria by a physician at the facility.

Recognizing her serious medical condition and need for treatment, shortly after being diagnosed with gender dysphoria, Defendants and their agents prescribed Ms. Poe with hormone therapy to treat her condition in 2019. She receives estradiol and spironolactone to treat her gender dysphoria and has been treated with these medications while NICI, during a period while not incarcerated, and now at ISCI, for the last five years. She also receives blood work every six months and meets with her doctor yearly to monitor the hormone therapy.

On June 13, 2024, Ms. Poe was told by members of the medical staff within ISCI that she would be tapered off her hormone therapy medications beginning July 1, 2024. The same day, a memo was sent to her and, she believes, another approximately 15 transgender people at ISCI whose gender dysphoria is treated with hormone therapyy, asking them to gather for a meeting the following week to discuss the changes in ISCI's ability to provide gender affirming medical care.

On June 20, 2024, Ms. Poe and other transgender individuals with gender dysphoria were gathered with the Warden, Head of Security, and Head of Medical, all acting pursuant to the command and under the authority of Defendants, who told them that due to HB 668 they would either be immediately cut off or tapered off their hormone therapy.

Ms. Poe cannot imagine losing the treatment that has allowed her to thrive. During a period between her incarcerations at NICI and ISCI, she suffered a lapse in her hormone therapy due to not having a means of transportation. During that time, she was mentally unstable. Ms. Poe suffered increased anxiety and depression. Her body went through a typical male puberty again and her dysphoria increased. She found it hard to sleep. While the changes in her body upon starting hormone therapy were gradual, after temporarily stopping, the changes came much more

quickly and she felt mentally and physically demoralized. She felt alternately cold, clammy, and hot and suffered pain and depression. She does not want to suffer this again. If she is cut off from her needed treatment on July 1, she fears she would suffer the same suicidality and severe mental pain and suffering as she did before.

*Plaintiff Jane Doe* is a transgender woman who has been incarcerated at ISCI since 2023.[3] She anticipates being incarcerated in Idaho for several more years. In 2020, before Ms. Doe was incarcerated, her general care physician diagnosed her with gender dysphoria.  Ms. Doe began gender affirming hormone therapy, in the form of intramuscular injections of Estradiol and Spironolactone, shortly thereafter to treat her gender dysphoria. She received this therapy for three years before her incarceration in IDOC. After starting the hormone therapy, Ms. Doe finally started feeling like herself. Her anxiety decreased. She was finally able to hold a job. She got her first apartment. Her quality of life drastically improved.  When Ms. Doe was first arrested in 2023, she was not provided hormone therapy in county jail. During that time Ms. Doe's breast tissue reduced, her testicles descended again, and she experienced intense dysphoria causing her feelings of anxiety, depression and despair.

Once Ms. Doe was moved to an IDOC facility, her gender dysphoria was discussed with a doctor and she was assessed to begin hormone therapy. A few months later Ms. Doe began to receive the treatment that she had previously relied on for her gender dysphoria and she has  now been back on those medications for three months. Immediately upon restarting her hormone therapy, Ms. Doe's dysphoria decreased. IDOC staff administer Ms. Doe's hormone therapy orally twice a day (morning and evening).

On June 13, 2024, ISCI's Clinician told Ms. Doe that she would be either cut off or tapered

---

[3] The following facts relating to Ms. Doe are contained in her Declaration in support of this Motion.

off her hormone therapy medications beginning July 1, 2024. Ms. Doe is concerned about how this will impact her. If she is not able to continue her prescribed hormone replacement therapy, she fears her gender dysphoria, anxiety and depression will grow severe.  Ms. Doe is aware of at least eleven other transgender people currently on hormone therapy, and three others in the process of obtaining hormone therapy, at ISCI.

## II.   GENDER DYSPHORIA

The term "gender identity" is a well-established concept in medicine, referring to one's internal sense of oneself as belonging to a particular gender.[4] All human beings have a gender identity and there is broad scientific understanding that gender identity is biologically based and a significant body of scientific and medical research that gender dysphoria has a physiological and biological etiology (cause or origin).  At birth, infants are typically classified as male or female. This classification becomes the person's birth-assigned sex. Typically, persons born with the external physical characteristics associated with males identify as men, and persons born with the external physical characteristics associated with females identify as women. However, for transgender individuals, this is not the case. Transgender individuals have a gender identity that differs from their birth-assigned sex. For some but not all transgender people, the incongruence between gender identity and assigned gender results in gender dysphoria, a serious medical condition characterized by a clinically significant distress resulting from that incongruence. Gender dysphoria is a recognized condition with treatment protocols followed by clinicians to provide evidence-based treatment.

Efforts to change a person's gender identity are unethical, harmful, and futile. Researchers have documented the risks and harms of attempting to coerce individuals to conform to their birth-

---

[4] The following facts relating to gender dysphoria and its treatment are contained in the Declaration of Randi Ettner in support of this Motion.

assigned sex. These include, but are not limited to, the onset or increase of depression, suicidality, substance abuse, loss of relationships, family estrangement, and a range of post-traumatic responses. *See* Byne (2016); Green, et al. (2020); Turban, et al. (2019). In other words, stopping treatment for gender dysphoria or refusing to recognize a person's gender identity does not prevent them from being transgender, it merely increases their distress.

Gender dysphoria can be ameliorated and managed through medical treatment. The standards of care for treatment of gender dysphoria are currently set forth in the *World Professional Association for Transgender Health (WPATH) Standards of Care* (8th version, 2022). These recommendations are also mirrored in the Endocrine Society's clinical practice guideline: "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society* Clinical Practice Guideline."

The WPATH promulgated Standards of Care ("SOC") are internationally recognized guidelines for the treatment of persons with gender dysphoria and inform medical treatment throughout the world. The American Medical Association, the Endocrine Society, the American Psychological Association, the American Psychiatric Association, the World Health Organization, the American Academy of Family Physicians, the American Public Health Association, the National Association of Social Workers, the American College of Obstetrics and Gynecology and the American Society of Plastic Surgeons all endorse treatment protocols in accordance with the SOC. *See.* Ettner Decl. ¶ 26. In addition, numerous courts have recognized the Standards of Care promulgated by WPATH as authoritative. The SOC are fully explained in Dr. Ettner's Declaration. *See* ¶¶ 25-43.

The treatment of incarcerated persons with gender dysphoria has been addressed in the SOC since 1998. As with protocols for the treatment of other medical conditions, medical

management of gender dysphoria for incarcerated individuals does not differ from protocols for non-institutionalized persons. Custodial status is not a medical justification to deviate from accepted standards of care or medically necessary treatment for any medical condition, including gender dysphoria. The SOC expressly state that all elements of the prescribed assessment and treatment are equally applicable to patients in prison (Chapter 11), and the National Commission on Correctional Health (NCCHC) recommends treatment in accordance with the SOC for people in correctional settings. *See* NCCHC Position Statement, *Transgender and Gender Diverse Health Care in Correctional Settings* (2020), https://www.ncchc.org/transgender-and-gender-diverse-health-care-in-correctional-settings-2020/.

For almost all individuals with persistent, well-documented gender dysphoria, hormone therapy is essential and medically indicated treatment to alleviate the distress of the condition. See SOC, Chapter 12. *See* Ettner Decl. The goals of hormone therapy for individuals with gender dysphoria are: (i) to significantly reduce hormone production associated with the person's sex assigned at birth and, thereby, the secondary sex characteristics of the individual's sex assigned at birth; and (ii) to replace circulating sex hormones associated with the person's sex assigned at birth with feminizing or masculinizing hormones, using the principles of hormone replacement treatment developed for hypogonadal patients (i.e., non-transgender males born with insufficient testosterone or non-transgender females born with insufficient estrogen). *See* Hembree et al. (2009).The therapeutic effects of hormone therapy are twofold: (i) with endocrine treatment, the patient acquires congruent sex characteristics, *i.e.*, for transgender women, breast development, redistribution of body fat, cessation of male pattern baldness, and reduction of body hair; and (ii) hormones act directly on the brain, via receptor sites for sex steroids, which produces an attenuation of dysphoria and attendant psychiatric symptoms, and the promotion of a sense of well-

being. *See, e.g.*, Cohen-Kettenis & Gooren (1993).

Gender dysphoria left untreated or inadequately treated, will result in serious psychological and physical harm. The depression and hopelessness associated with the condition causes suicidal ideation, which will result in actual suicide for many individuals. A recent survey found a 41% rate of suicide attempts among this population, which is far above the baseline suicide attempt rates for North America. Mak et al. (2020). Additionally, transgender women with gender dysphoria without access to appropriate care are often so desperate for relief that they resort to life-threatening attempts at auto-castration (the removal of one's testicles) or auto-penectomy (the removal of one's penis). Brown & McDuffie (2009 In sum, the results of providing inadequate treatment are predictable and dire, and take one of three paths: profound psychological decompensation, attempts at surgical self-treatment, or suicidality and suicide.

In addition to the risks outlined above, the potential risks of harm are more severe here than in most other cases because Idaho's law contemplates cutting prisoners off of treatment that they have relied on for years or even decades regardless of medical need or medical risk of withdrawing care. This means not only will individuals be cut off of the treatment that may have kept them stabilized and alive for many years, some individuals who have had an orchiectomy and need hormone therapy in the absence of the body's endogenous production of hormones, will have no recourse to maintain hormone production. As the SOC recognize: "The consequences of abrupt withdrawal of hormones or lack of initiation of hormone therapy when medically necessary include a significant likelihood of negative outcomes (Brown, 2010; Sundstrom and Fields v. Frank, 2011), such as surgical self-treatment by autocastration, depressed mood, increased gender dysphoria, and/or suicidality (Brown, 2010; Maruri, 2011)." SOC at S106.

The SOC are clear that transgender "persons who enter an institution on an appropriate

regimen of gender-affirming hormone therapy should be continued on the same or similar therapies and monitored according to the SOC Version 8." SOC at S106. This is basic medical care that has been a central part of prison medical treatment for decades. It is dangerous enough to not increase treatment appropriately for those who need it, but cutting people off of treatment is a level of callousness that has not even been contemplated for years.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that [s]he is likely to succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2009); *Pimentel v. Dreyfus*, 670 F. 3d 1096, 1105 (9th Cir. 2012) (applying *Winter* to claim under 42 U.S.C. § 1983). "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted). "Where, as here, the government opposes a preliminary injunction, the third and fourth factors merge into on inquiry." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021).

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR EIGHTH AMENDMENT CLAIMS.

A state has a constitutional duty to "provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). It is well-established that "[d]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment. *Id.* (internal citation omitted). Prison officials are liable for violations under the Eighth Amendment when they are deliberately

indifferent to a substantial risk of serious harm to a prisoner, which the Supreme Court has described as "the equivalent of recklessly disregarding that risk." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).

A plaintiff establishes deliberate indifference by showing (1) a serious medical need such that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain, and (2) that defendants' chosen course of treatment was medically unacceptable under the circumstances and pursued in conscious disregard of an excessive risk to the plaintiff's health. *Edmo* v. Corizon, Inc., 935 F.3d 757, 785-786 (9th Cir. 2019).

### A. Plaintiffs' Gender Dysphoria and Risk of Self-Harm Are Objectively Serious Medical Needs for Purposes of the Eighth Amendment.

It is uncontested in this case that Plaintiffs have gender dysphoria. Plaintiffs' gender dysphoria, which has been diagnosed and treated by Defendants and their agents, is a serious medical need for purposes of the Eighth Amendment.

Courts have consistently recognized gender dysphoria, and the attendant risk of self-harm that is caused by untreated gender dysphoria, to be a serious medical condition for the purposes of the Eighth Amendment, so much so that it is frequently uncontested. *E.g.*, *Edmo*, 935 F.3d at 785; *Fields v. Smith*, 653 F. 3d 550, 555 (7th Cir. 2011) (discussing cases finding that Gender Identity Disorder[5] is a "serious medical need" for purposes of the Eighth Amendment); *De'lonta*, 708 F.3d 520, 525-26 (4th Cir. 2013); *Kosilek v Spencer*, 774 F.3d 63, 86 (1st Cir. 2014) ("That GID is a serious medical need, and one which mandates treatment, is not in dispute in this case."; *Zayre-Brown v. North Carolina Department of Public Safety*, No. 3:22-cv-191, 2024 WL 410243 (W.D. N.C., February 2, 2024). *Hicklin v. Precynthe*, No. 4:16- cv-02357-NCC, Dkt. No. 176, at 5 (E.D. Mo. May 22, 2018) ("Gender dysphoria is an objectively serious medical need.");; *Monroe v.*

---

[5] Gender Identity Disorder is the precursor diagnosis to Gender Dysphoria.

*Baldwin*, 424 Supp. 3d 526, 542 (S.D. Ill, 2019); *Kothman v. Rosario*, 558 Fed App'x 907, 912 (11th Cir. 2014); *Iglesias v. Federal Bureau of Prisons*, 2021 WL 6112790, at *17 (S.D. Ill. Dec. 27, 2021); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1187-88 (N.D. Cal. 2015).

The record before the Court, filed by Plaintiffs in support of this motion, demonstrates that gender dysphoria is a medical condition codified in the DSM-V, and that the consensus among mainstream medical associations in the United States is that gender dysphoria is a serious medical condition requiring treatment. Plaintiffs have shown that they were diagnosed with gender dysphoria by Defendants' own medical providers, and that, when left untreated, this condition causes them severe psychological and emotional pain that impairs their mental and physical health. When left untreated, gender dysphoria increases rates of depression and anxiety, which in turn can lead to self-harm and even suicide. Ettner Decl. ¶¶ 56-59.

**B.      By Categorically Cutting Off and Denying Plaintiffs Needed Treatment Based on a Blanket Rule, Defendants Have Acted With Deliberate Indifference.**

The evidence also overwhelmingly demonstrates that Defendants' decision to imminently cut off Plaintiffs' medically necessary treatment for their serious medical conditions constitutes deliberate indifference for the purposes of the Eight Amendment.

Deliberate indifference may be demonstrated "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Jett v. Penner,* 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotations and citations omitted). The Eighth Amendment requires that prisoners be provided with adequate medical care based on an individualized assessment of medical need. *See Colwell v. Bannister*, 763 F.3d 1060, 1068 (9th Cir. 2014) (holding that the "blanket, categorical denial of medically indicated surgery solely on the basis of an administrative policy ... is the paradigm of deliberate indifference" (quotation omitted)). Given this need for individualized assessment,

exclusionary policies that bar certain forms of medical treatment regardless of medical need for the treatment violate the Eighth Amendment. *See Johnson v. Wright*, 412 F.3d 398, 406 (2d Cir. 2005) (denial of hepatitis C treatment to a prisoner based on a policy that a particular drug could not be administered to inmates with recent history of substance abuse could constitute deliberate indifference since policy did not allow exceptions based on medical need); *Mahan v. Plymouth Cnty. House of Corr.*, 64 F.3d 14, 18 n.6 (1st Cir. 1995) ("inflexible" application of prescription policy may violate Eighth Amendment); *Jorden v. Farrier*, 788 F.2d 1347, 1349 (8th Cir. 1986) (application of prison pain medication policies must be instituted in a manner that allows individualized assessments of need).

Courts have routinely held prison policies that automatically exclude certain forms of treatment for gender dysphoria violate the Eighth Amendment. *See Rosati v. Igbinoso*, 791 F.3d 1037, 1040 (9th Cir. 2015) (alleged blanket ban on gender confirmation surgery and denial of gender confirmation surgery to plaintiff with severe symptoms, including repeated self-castration attempts, states an Eighth Amendment claim; *Allard v. Gomez*, 9 Fed. App'x. 793, 795 (9th Cir. 2001) ("[T]here are at least triable issues as to whether hormone therapy was denied Allard on the basis of an individualized medical evaluation or as a result of a blanket rule, the application of which constituted deliberate indifference to Allard's medical needs."); *Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011) (same for hormone therapy and sex reassignment surgery).

In *Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011), the Seventh Circuit held that a state law that barred hormone therapy and sex reassignment surgery as possible treatments for prisoners with gender dysphoria facially violated the Eighth Amendment. Similarly, in *De'lonta I*, 330 F.3d 630, the Fourth Circuit held that a prisoner with gender dysphoria stated a claim for deliberate indifference where the Department of Corrections withheld hormone therapy pursuant to a policy

against providing such treatment and not the medical judgment of qualified providers. *See also Soneeya*, 851 F. Supp. 2d at 249 (holding that a prison policy that "removes the decision of whether sex reassignment surgery is medically indicated for any individual inmate from the considered judgment of that inmate's medical providers" violated Eighth Amendment); *Barrett v. Coplan*, 292 F. Supp. 2d 281, 286 (D.N.H. 2003) ("A blanket policy that prohibits a prison's medical staff from making a medical determination of an individual inmate's medical needs [for treatment related to gender identity disorder] and prescribing and providing adequate care to treat those needs violates the Eighth Amendment.").

There can be no serious debate that Defendants are aware that Plaintiffs' gender dysphoria requires medical treatment because Plaintiffs are currently receiving such treatment from Defendants' own health care providers, pursuant to IDOC's directive. HB 668 imposes a blanket prohibition against the provision of the care to treat gender dysphoria, without an exception based on medical need. Absent an order from the Court preventing the enforcement of HB 668, Defendants will discontinue treating Plaintiffs' gender dysphoria without regard for their continued medical need to receive this treatment. By exhausting IDOC's administrative grievance process, Plaintiffs have placed Defendants on notice of Plaintiffs' serious medical need for continued treatment of their gender dysphoria. Yet they have been informed by IDOC officials that their medical treatment for gender dysphoria will be discontinued beginning July 1, 2024 when HB 668 is set to take effect. Pls' Decls.

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE INJURIES ABSENT AN INJUNCTION

To obtain a preliminary injunction, Plaintiffs need not demonstrate that irreparable injury is inevitable, but only that it "is likely in the absence of an injunction." *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 22 (2008). Here, irreparable injury is inevitable and imminent. Plaintiffs have

been informed that beginning on July 1, 2024, the medically necessary care that they currently receive to treat their gender dysphoria will be discontinued. Discontinuing Plaintiffs' medically necessary care will imminently cause irreparable injuries, including increased risk of suicidality, self-harm, anxiety and depression. *See Edmo* at 797-798 ("sever, ongoing psychological distress" and a "high risk of self-castration and suicide" constitute irreparable harm); *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) ("pain, infection, amputation, medical complications, and death" constitute irreparable harm). Additionally, Plaintiffs will also suffer irreparable harm in the deprivation of their constitutional rights. See *Edmo* at 798 (deprivation of one's "constitutional right to adequate medical care is sufficient to establish irreparable harm.")

### III.   THE BALANCE OF HARMS STRONGLY FAVORS PLAINTIFFS AND AN INJUNCTION AGAINST THE ENFORCEMENT OF H.B. 668 IS IN THE PUBLIC INTEREST.

Because Defendants are government officials, the balancing of the harms and the public interest inquiries merge. *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021). The balancing of the harms "concerns the burdens or hardships" to the Plaintiffs if their request for an injunction is denied, and those to the Defendants if the injunction is issued. *Id*. at 1050. "The 'public interest' mostly concerns the injunction's 'impact on nonparties rather than parties.'" *Id.*

The balance of harms strongly favors the Plaintiffs. As Plaintiffs have shown, the harm they will experience if H.B. 668 takes effect is significant. The harms caused by withholding to withdrawing medical necessary care to treat gender dysphoria are identified in Plaintiffs' declarations, and are extensively detailed by their medical expert, Dr. Ettner. Every day without access to the necessary treatment for their gender dysphoria will cause Plaintiffs' mental health to deteriorate and their risk of future suicidality and self-harm to increase. The risk to their mental and physical health is both great and certain. (Ettner Decl. ¶¶ 56-59).

On the other side of the scale, Defendants will not suffer any harm – much less irreparable harm – from providing necessary medical care to Plaintiff consistent with their constitutional obligations. *See, e.g., Gammett v. Idaho State Bd. of Corrs.*, No. CV05–257, 2007 WL 2186896, at *15-16 (D. Idaho July 27, 2007) (balance of harms "sharply" favored plaintiff, who would experience extreme mental harm, including suicide attempts, without GID treatment, while defendants did not allege that they would suffer harm from providing such treatment). The government cannot suffer harm by being required to comply with their constitutional obligation to provide adequate medical treatment. *Porretti v. Dzurenda*, 2020 WL 2857498 (D. Nev., May 31, 2020); affirmed *Porretti v. Dzurenda*, 11 F.4th 1037, 1050-1051 (9th Cir. 2021).

Finally, the public interest weighs strongly in favor of Plaintiffs. The public has an interest in ensuring the continued dignity of incarcerated individuals, and "'inherent in that dignity is the recognition of serious medical needs, and their adequate and effective treatment' pursuant to the Eight Amendment's mandated standard of care." *Id*. (quoting the district court and finding no abuse of discretion.) "It is always in the public interest to prevent the violation of a party's constitutional rights." *Id*. (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

## IV.   BOND SHOULD BE WAIVED.

Plaintiffs seek an injunction of unconstitutional conduct by a governmental entity, and because there is no risk of monetary harm to Defendants if they are eventually found to be wrongfully enjoined, the FRCP 65(c) bond is neither appropriate nor necessary in this case and should be waived. *See Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011); *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996).

## V.   PROVISIONAL CLASS CERTIFICATION IS WARRANTED.

This case challenges a statute of general applicability that will affect dozens if not hundreds of transgender adults in the State of Idaho. This case is appropriate for class certification pursuant

to Fed. R. Civ. P. 23(a) and (b)(2). Courts in the Ninth Circuit routinely grant provisional class certification for purposes of a temporary restraining order or preliminary injunction, and courts apply the same standard as applied to class certification motions in the normal course. *See Maney v. Brown*, 516 F.Supp.3d 1161, 1171-73 (D. Or. Feb. 2, 2021) (granting provisional class certification to a class of prisoners bringing Eight Amendment claim and granting related TRO); *Carrillo v. Schneider Logistics, Inc.*, 2012 WL 556309, at *9 (C.D. Cal. Jan. 31, 2012) (citing Barahona-Gomez v. Reno, 167 F.3d 1228, 1233 (9th Cir. 1999)).

"[T]he primary role of [FRCP 23(b)(2)] has always been the certification of civil rights class actions." *Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014); *see also Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997) ("Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" (citations omitted)).

The four requirements, as articulated below, must be satisfied for individuals to sue on behalf of a class. Fed. R. Civ. P. 23(a). In addition, Plaintiffs seek certification pursuant to Fed. R. Civ. P. 23(b)(2), which Plaintiffs satisfy because Defendants have acted or refused to act on grounds generally applicable to the class. See Fed. R. Civ. P. 23(b)(2).

In ruling on a motion for class certification, the court may consider hearsay and similar evidence, such as declarations, that would be inadmissible at trial. *See, e.g., Sali v. Corona Regional Medical Center*, 909 F.3d 996, 1004 (9th Cir. 2019) (noting that at the class certification "stage, a district court may not decline to consider evidence solely on the basis that the evidence is inadmissible at trial"). Here, the declarations and other evidence submitted by Plaintiffs support a finding that Plaintiffs have established all requirements for class certification.

## A.    The Putative Class Is Sufficiently Numerous.

Rule 23(a)(1) requires that each class be sufficiently numerous to make joinder of the

members impracticable, but it does not require a specific number of class members. *See Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980) (citing cases) (numerosity requirement not tied to any fixed numerical threshold—numerosity "requires examination of the specific facts of each case and imposes no absolute limitations").

The Ninth Circuit evaluates numerosity according to the standards set forth in *Jordan v. County of Los Angeles*, 669 F.2d 1311 (9th Cir. 1982), *vacated*, 459 U.S. 810 (1982), on remand, 713 F.2d 503 (9th Cir. 1983), *modified*, 726 F.2d 1366 (9th Cir. 1984). Under this framework, a court must consider what the evidence shows concerning "the absolute number of class members." *Jordan*, 669 F.2d at 1319. Class size "is not the sole determining factor" and in determining the total number of class members, "Plaintiffs are not required to allege the exact number or identity of all class members." *Hawecker v. Sorenson*, 2011 WL 98757 (E.D. Cal. Jan 12, 2011).

Moreover, future members of the putative class must be considered. In the Ninth Circuit, courts "have recognized that when, as here, a class's membership changes continually over time, that factor weighs in favor of concluding that joinder of all members is impracticable." *A.B. v. Hawaii*, 30 F.4th at 838; *see also Rodriguez v. Hayes*, 591 F.3d 1105, 1118 (9th Cir. 2010) ("The inclusion of future class members in a class is not itself unusual or objectionable," because "[w]hen the future persons referenced become members of the class, their claims will necessarily be ripe."); *Jordan*, 669 F.2d at 1320 (finding joinder impracticable where the class at issue was "composed of unnamed and unknown future black applicants who may be discriminated against by the County's employment practices").

Courts have granted class certification where the class size is greater than 15. *See Rannis v. Recchia*, 380 Fed.Appx. 646 (9th Cir.2010) (class of 20 satisfies the numerosity requirement); *Allison v. Dolich*, 815 Fed.Appx. 135 (9th Cir. 2020) ("We are not aware of any absolute bar against

subclasses of [35-50] people"); *Legere-Gordon v. Firstcredit Incorporated*, 2021 WL 276695 (D. Idaho 2021) (numerosity satisfied where 40 or more); *Ark. Educ. Ass'n v. Bd. of Educ.*, 446 F.2d 763, 765–66 (8th Cir.1971) (upholding class of 20); *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir.1967) (upholding class of 18).

Here, Plaintiffs have identified at least 24 class members from two IDOC facilities. IDOC operates nine facilities, so the number is certainly greater than 24.  In any event, 24 current class members is sufficient, particularly where, as here, new members will continually join the class in the future.

**B.  The Named Plaintiffs Claims Raise Common Issues of Law and Fact and Are Typical of the Class.**

The commonality requirement of Rule 23(a)(2) requires plaintiffs seeking class certification to show that their claims "depend upon a common contention" that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350, 131 S.Ct. 2541.

"The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). Because the considerations underlying the two requirements overlap considerably, the Supreme Court has noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Falcon*, 457 U.S. at 157 n.13, 102 S.Ct. 2364.

Here, there are questions of law or fact common to the Class and Plaintiffs' claims are typical of the classes. Without the preliminary injunction, Defendants will enforce HB 668 uniformly against all members of the Class. This lawsuit presents common questions of law,

including whether HB 668 violates the Eight Amendment. If Defendants are permitted to enforce HB 668, all members of the Class will continue to be subject to a common impact: the cessation of their gender-affirming medical care and/or inability to obtain gender-affirming medical care. All class members seek the same relief: an injunction preventing enforcement of HB 668. Moreover, Plaintiffs' claims are typical of those of the class. They are all transgender adults who seek to continue receiving GAMC prohibited by HB 668 and who, but for an injunction, are, or would be, prohibited from receiving such medical care by Defendants' enforcement of HB 668.

Moreover, HB 668 does not allow for the consideration of a transgender individual specific circumstances. It is the fact that Defendants will enforce HB 668's ban on GAMC across the board to all transgender individuals incarcerated in Idaho prisons that renders enforcement "conduct" common to the class. The named Plaintiffs have a substantial stake in these proceedings and seek an injunction that will benefit all members of the classes.

### C.    Plaintiffs Seek Injunctive Relief from that Is Generally Applicable to the Class.

Plaintiffs must also demonstrate that one of the requirements of Federal Rule 23(b) is met. Here, plaintiffs seek certification pursuant to Rule 23(b)(2), which requires that the party opposing certification have "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the class as a whole." The requirements of FRCP 23(b)(2) "are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014).

Here, plaintiffs challenge a statute of general applicability. Defendants intend to enforce HB 668 and such enforcement will immediately and detrimentally affect the named Plaintiffs and members of the putative classes. Plaintiffs seek to prevent this injury by enjoining the statute.

### D.   The Court should appoint plaintiffs' attorneys as class counsel pursuant to Rule 23(g).

"Absent a basis for questioning the competence of counsel, the named plaintiffs' choice of counsel will not be disturbed, and plaintiffs' bear no affirmative burden to allege facts establishing the competence of counsel in the complaint." *Mateo v. M/S Kiso*, 805 F.Supp. 761, 771 (N.D. Cal. Aug. 13, 1991); *see also Wehner v. Syntex Corp.*, 117 F.R.D. 641, 644 (N.D.Cal.1987) ("It is presumed plaintiffs' counsel is competent to litigate this case and will fairly and adequately represent the interests of the class members").

The attorneys of the American Civil Liberties Union Foundation and ACLU of Idaho Foundation possess substantial expertise litigating constitutional and civil-rights challenges to governmental action, including specific experience representing transgender plaintiffs in civil rights and prisoner's rights litigation. The plaintiffs' attorneys are adequate class counsel and should be so appointed pursuant to Rule 23(g).

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for a Temporary Restraining Order and for Provisional Class Certification, and that the Court permit the parties to set a briefing schedule for Plaintiffs' Motion for Preliminary Injunction.

Date:      June 28, 2024                                          Respectfully submitted,

                                                                 /s/ *Paul C. Southwick*
                                                                 Paul C. Southwick