



## International Journal of Transgenderism

ISSN: 1553-2739 (Print) 1434-4599 (Online) Journal homepage: www.tandfonline.com/journals/wijt20

# Whole-incarceration-setting approaches to supporting and upholding the rights and health of incarcerated transgender people

Annette Brömdal, Kirsty A. Clark, Jaclyn M.W. Hughto, Joseph Debattista, Tania M. Phillips, Amy B. Mullens, Jeff Gow & Kirstie Daken

**To cite this article:** Annette Brömdal, Kirsty A. Clark, Jaclyn M.W. Hughto, Joseph Debattista, Tania M. Phillips, Amy B. Mullens, Jeff Gow & Kirstie Daken (2019) Whole-incarceration-setting approaches to supporting and upholding the rights and health of incarcerated transgender people, International Journal of Transgenderism, 20:4, 341-350, DOI: 10.1080/15532739.2019.1651684

**To link to this article:** https://doi.org/10.1080/15532739.2019.1651684

Published online: 16 Aug 2019.

Submit your article to this journal 

Article views: 7963

View related articles 

View Crossmark data 

Citing articles: 32 View citing articles

INTERNATIONAL JOURNAL OF TRANSGENDERISM
2019, VOL. 20, NO. 4, 341–350
https://doi.org/10.1080/15532739.2019.1651684





GUEST EDITORIAL

# Whole-incarceration-setting approaches to supporting and upholding the rights and health of incarcerated transgender people

Transgender people incarcerated[1] around the world remain a "vulnerable group," and continue to experience significant mistreatment, human rights violations, and erasure of their gender identity, conferring greater risk of trauma, suicide, and self-harm than experienced by the general incarcerated population (Brömdal, Mullens, Phillips, & Gow, 2019b; Brömdal et al., 2019a; Longo, 2017; Lydon, Carrington, Low, Miller, & Yazdy, 2015; Malkin & DeJong, 2018; Markshamer & Tobin, 2014; National Center for Transgender Equality, 2018a; White Hughto et al., 2018). As transgender rights and health scholars focused on alleviating injustices, we recommend a "whole system" approach to ensuring the wellbeing of transgender individuals incarcerated across global contexts.

Inspired by Bartholomaeus and Riggs' (2017) holistic "whole-of-school approaches to supporting transgender students, staff, and parents," in this editorial, we call for a "whole-incarceration-setting approach" to support and uphold the rights and health of incarcerated transgender people, including those who become incarcerated following arrest, before sentencing and while serving their sentence, as well as immigration detention. A whole-incarceration-setting approach focuses on the responsibilities of every member (staff and other incarcerated people) entering the incarceration system in ensuring all transgender people are provided an inclusive, gender-affirming, dignified, safe, and secure living environment. Endorsed by the World Health Organization (WHO, 1986) as a "best practice" for working comprehensively to promote health and wellbeing for diverse communities, including incarcerated people (Enggist, Møller, Galea, & Udesen, 2014), the holistic, whole-setting approach recognizes the social, political, legal, medical, economic, and demographic contexts within which incarceration-settings operate and impact health (Enggist et al., 2014; World Health Organization, 1986). Thus, we argue that a whole-setting approach, which goes beyond the foci of solely safety and security often prioritized in incarceration settings, is best practice to support the health and rights of incarcerated transgender people. Thus, the goals of this editorial are twofold: first, we aim to summarize the challenges associated with upholding transgender people's rights and health while incarcerated; and, second, we aim to offer recommendations for how incarceration settings might enact a whole-setting approach to ensure that the rights and health of transgender people are promoted and upheld.

## The global incarceration of transgender populations

Most incarceration settings around the world are segregated by sex assigned at birth (i.e., male or female), and therefore, do not routinely collect and/or transparently share data regarding the gender identity of incarcerated people (Brömdal et al., 2019b; Routh et al., 2017; Scott, 2013; White Hughto et al., 2018). Further, because many incarcerated transgender people may be reticent to disclose their gender identity due to fear of safety concerns (White Hughto et al., 2018), it is difficult to estimate the size of this population in the United States (US), Australia, and globally (International Bar Association LGBTI Law Committee, 2015; Lamble, 2012; Lynch & Bartels, 2017; Newcomen, 2017). While there currently are no known systematic efforts to identify transgender individuals within US prisons, recent estimates suggest that close to 16% of transgender individuals have been incarcerated at some point during their lifetime (Grant et al., 2011), compared with 2.8% to 6.6% of the US general population (Bonczar, 2003; Glaze & Kaeble, 2014). Further, the incarceration rate of transgender people of color (e.g., Black/African-American, Latinx/Hispanic, multi-racial, and Native American/Alaskan Native) and from low-income backgrounds is elevated (Lydon et al., 2015), with estimates suggesting that 47% of Black transgender people in the US have been incarcerated at some point during their lifetime (Grant et al., 2011). Similar patterns have been observed in Australia where 60% of formerly incarcerated transgender informants in one study were of Australian Aboriginal background (Brömdal et al., 2019a; Mullens et al., 2019), a finding that parallels national averages, where Aboriginal and Torres Strait Islander peoples are overrepresented compared to non-Indigenous people (Anthony, 2017; Australian Institute of Health & Welfare, 2019; Lynch & Bartels, 2017; Wilson et al., 2017). While there is limited information on the number of incarcerated transgender people globally, some regions of the United Kingdom (UK) have recently begun recording the number of transgender people incarcerated in their systems. Indeed, a December 2018 report estimated that out of the 7,772 people incarcerated in Scotland (Scottish Prison Service [SPS], 2019) 20 were transgender (Taylor, 2018). Reports by the Ministry of Justice in England and Wales reported

© 2019 Taylor & Francis Group, LLC

in November 2017 that out of a cohort of 85,556 people across 47 prisons (Ministry of Justice, National Offender Management Service, HM Prison Service, & Her Majesty's Prison and Probation Service, 2017), 125 were transgender people (Beard, 2018). While the number of currently-incarcerated people in these regions in the UK might seem low, the point prevalence of this population is not ideal for assessing the burden of incarceration among transgender people as the aforementioned safety concerns associated with reporting gender identity in correctional settings can lead to underreporting of one's transgender experience or identity. Additionally, transgender individuals often cycle in and out of the criminal justice system due to low-level offenses (Grant et al., 2011; James et al., 2016), leading to variability in the number of currently incarcerated transgender people at any point in time. Nonetheless, research suggests that transgender people are overrepresented in the criminal justice system in the US, Australia, and elsewhere around the globe (Brömdal et al., 2019a; Gorden, Hughes, Roberts, Astbury-Ward, & Dubberley, 2017; Lamble, 2012; Lynch & Bartels, 2017; National Center for Transgender Equality, 2018a; Newcomen, 2017; Perkins, 1991; Poole, Whittle, & Stephens, 2002; Tarzwell, 2006; Wilson et al., 2017).

The overrepresentation of transgender individuals in incarceration settings stems, in part, from societal stigma across cultures and heightened stigma due to affiliation with multiple marginalities (Quinn & Earnshaw, 2013). Transgender stigma can contribute to employment discrimination and poverty, forcing some transgender people to engage in illegal activities (e.g., sex work, drug sales) that place them at greater risk for arrest and incarceration (Garofalo, Deleon, Osmer, Doll, & Harper, 2006; Glezer, McNiel, & Binder, 2013; Grant et al., 2011; James et al., 2016; National Center for Transgender Equality, 2018a; Nemoto, Bödeker, & Iwamoto, 2011; Reisner, Bailey, & Sevelius, 2014). Further, biased policing and sentencing practices also contribute to the disproportionate incarceration among transgender people, with transgender people of color facing a double-burden of bias based on both race and gender identity (Grant et al., 2011; James et al., 2016; National Center for Transgender Equality, 2018a; Wolff & Cokely, 2007). Once incarcerated, transgender individuals are usually placed in either male or female facilities according to their sex at birth, or more specifically their genitalia (Brömdal et al., 2019a; Sevelius & Jenness, 2017). Thus, transgender individuals are often placed in facilities that do not align with their gender identity where they are at greater risk for verbal, physical, and sexual assault (Atabay, 2009; Brömdal et al., 2019a, 2019b; Gatherer, Atabay, & Hariga, 2014; Longo, 2017; Lydon et al., 2015; Malkin & DeJong, 2018; Markshamer & Tobin, 2014; National Center for Transgender Equality, 2018a; Oparah, 2012; Phillips et al., in press; US Department of

Justice, 2012; von Dresner, Underwood, Suarez, & Franklin, 2013; White Hughto et al., 2018).

## The lived experiences of incarcerated transgender people across the globe

There is limited research regarding the lived experiences of incarcerated transgender people, especially transgender men (Brömdal et al., 2019a, 2019b). In fact, the majority of reported research has been conducted with transgender women and within the North American context. However, recently, European researchers (Gorden et al., 2017) and the European Parliament have recognized the lack of European discourse on incarcerated transgender people and have encouraged researchers to critically examine this context (Castagnoli, 2010; International Bar Association LGBTI Law Committee, 2015). While much research is needed across Asia, Africa, and South America, the existing, albeit limited research from outside the US, including in Australia (Blight, 2000; Brömdal et al., 2019a; Butler et al., 2010; Lynch & Bartels, 2017; Mullens et al., 2019; Perkins, 1991; Richters et al., 2008; Wilson et al., 2017; Yap et al., 2011), is consistent with US findings in describing how mistreatment, violence, and indifference are the norm rather than the exception for incarcerated transgender people.

### *Violence, abuse, and harassment towards incarcerated transgender people*

Transgender individuals across the globe experience violence, abuse, harassment and assault in correctional settings. Much of this mistreatment occurs at the hands of fellow incarcerated individuals. A 2015 study of 27,715 transgender people in the US found that among the 554 transgender people who had been incarcerated in the past year, 43% reported they had been physically assaulted and 17% had been sexually assaulted by another incarcerated person – a sexual assault rate that is nine to ten times higher than that of the general US incarcerated population (James et al., 2016). Transgender women incarcerated in male settings are particularly vulnerable with those in the US, Australia, and the UK reporting that their transgender identity greatly increases their risk of being raped and coerced into sexual activities by other incarcerated people - experiences which correctional staff (correctional officers, healthcare providers, and administrators) frequently fail to report or prevent (Brömdal et al., 2019a, 2019b; Dolovich, 2011; Gorden et al., 2017; Grant et al., 2011; Hagner, 2010; Holman & Goldberg, 2006; James et al., 2016; Jenness & Fenstermaker, 2016; Lara, 2010; Longo, 2017; Lydon et al., 2015; Lynch & Bartels, 2017; National Center for Transgender Equality, 2018a; Newcomen, 2017; Rosenberg & Oswin, 2015; Wilson et al., 2017). Incarcerated transgender women also report being



treated with indifference, ridiculed, and sexually and physically violated by those working in the system. A 2011 study of 6,454 transgender and gender non-conforming people in the US found that among the 749 transgender women who had been incarcerated, 38% reported they had been harassed, 9% physically assaulted, and 7% sexually assaulted by correctional staff (Grant et al., 2011). US-based research also finds that experiences of harassment and physical or sexual assault by correctional officers are particularly elevated among racial/ethnic minority transgender people relative to their non-racial/ethnic minority counterparts (Grant et al., 2011). In addition to physical and sexual assault, gender-based mistreatment of incarcerated transgender people by correctional officers and healthcare providers can come in the form of misgendering (i.e., using the incorrect name or pronoun – at times intentionally) as well as restricting access to gender-appropriate clothing, grooming items, and even medically-necessary, gender-affirming medical and psychological healthcare, including hormone therapy (Brömdal et al., 2019b; Lydon et al., 2015; National Center for Transgender Equality, 2018a, 2018b). Further, transgender individuals who attempt to violate gender-related policies (e.g., grooming standards) are often met with punishment by correctional staff including citations that can lead to longer prison sentences, the restriction of privileges, and solitary confinement (Brömdal et al., 2019a, 2019b; Brown, 2014; Clark, White Hughto, & Pachankis, 2017; Longo, 2017; Lydon et al., 2015; Lynch & Bartels, 2017; National Center for Transgender Equality, 2018a; Sumner & Sexton, 2015; Tarzwell, 2006).

## Lack of adequate gender-affirming medical care

In addition to overt harassment and abuse, transgender individuals face restricted access to medically necessary care in incarceration settings in the US and throughout the world. To that end, research from Australia suggests that correctional healthcare providers often lack transgender-specific health knowledge, and, in some cases, regularly deny general, mental, and gender-affirming medical care (Brömdal et al., 2019a; Lynch & Bartels, 2017; Wilson et al., 2017). In the US, such denial of care has been linked to limited clinical competency about how to care for transgender people as well as restrictive policies that prevent healthcare providers from providing gender-affirming care including hormone therapy and surgery (Clark et al., 2017; White Hughto et al., 2018). Limited access to care among incarcerated transgender people has been described as a form of "double punishment," insofar as transgender people are punished "first by the pervasive discrimination in the judicial system that continues to fail to give due legal recognition of transgender people's right to dignity and self-identity, and second by the often "cruel and unusual" mistreatment of them in the prison" (Erni, 2013, p. 139).

It has been argued that this "double punishment" is a breach of the duty governments and incarceration systems have in ensuring humane care for transgender people (Mintz, 2013). The systematic denial of medically-necessary care to incarcerated transgender people has resulted in several lawsuits in which individuals successfully sued the US government on the basis that the denial of healthcare represents cruel and unusual punishment in violation of their 8th amendment rights (Edney, 2004; Peek, 2004; Philipps et al., in press; Tarzwell, 2006).

## Solitary confinement and prolonged "protective custody"

Globally, solitary confinement refers to "the physical and social isolations of an individual in a single cell for 22.5 to 24 hours a day, with the remaining time typically spent exercising in a barren yard or cage" and this "regime can last for months or years and can be of an indeterminate duration" (Shalev, 2014). Correctional staff working in male prisons in the US and Australia have been reported to place transgender women in solitary confinement for extended periods disguised as a measure of "safety" and "protection" from abuse from other incarcerated people, also known as "protective custody" or "administrative segregation" (Brömdal et al., 2019a; Lydon et al., 2015; National Center for Transgender Equality, 2018a; Phillips et al., in press). US and international courts consider prolonged periods of confinement tantamount to torture (Lobel, 2008; Phillips et al., in press). Thus, it follows, that even in the case when transgender individuals are reportedly isolated for their safety, such isolation can potentially have significant and pervasive damaging psychological health consequences (Brömdal et al., 2019a; Edney, 2004; Lobel, 2008; Peek, 2004; Philipps et al., in press; Tarzwell, 2006) and may in some cases amount to torture (Brömdal et al., 2019a; International Commission of Jurists, 2007; Lydon et al., 2015; National Center for Transgender Equality, 2018a; Office of the United Nations High Commissioner for Human Rights, 2007; Phillips et al., in press; United Nations Office on Drugs & Crime, 2015).

## Health consequences of discrimination and violence for incarcerated transgender people

The above-mentioned physical, verbal, and sexual abuse, lack of access to gender-affirming healthcare, erasure of gender identity, and unnecessary use of solitary confinement and protective custody experienced by incarcerated transgender people has been linked to dire health consequence for this population in the US, Australia, and worldwide. Indeed, many incarcerated transgender people have been found to have elevated levels of depression, anxiety and other significant mental health concerns as well as engage in self-harm, attempted

suicide, and surgical self-treatment (for example, auto-castration among transgender women) in a desperate attempt to cope with their untreated gender-related medical needs and care (Brömdal et al., 2019a, 2019b; Brown, 2010; Coleman et al., 2012; Gorden et al., 2017; Mann, 2006; National Center for Transgender Equality, 2018a; Phillips et al., in press; Tarzwell, 2006). These health consequences not only highlight the need to improve upon existing strategies used to protect transgender people in carceral settings but also warrant the consideration of novel approaches to improving the mental and physical health of this highly vulnerable population.

## The whole-incarceration-setting approach

In light of the many significant harms experienced by incarcerated transgender people (e.g., lack of gender-affirming policies; lack of adequate gender-affirming medical care; solitary confinement and prolonged protective custody; various forms of indifference, violence, abuse, and harassment; restricted access to gender-appropriate clothing and grooming items; and misgendering), the whole-incarceration-setting approach is an innovative strategy that, if implemented comprehensively, can result in correctional settings that are more inclusive, gender-affirming, supportive, humane, and safe for this population. We believe a holistic approach will be of significant benefit to transgender people as well as to those managing the system, their staff, and the general population of incarcerated people. A holistic, cross-cutting approach that targets gender-affirming change at multiple levels (e.g., administration, correctional officers, healthcare provision), can result in a mentally and physically healthier prison population that also facilitates the universal mandate of ensuring safety and security of all incarcerated individuals, correctional staff, and the larger community. In an effort to begin this holistic conversation with stakeholders, we have compiled a number of recommendations that we believe can facilitate gender-affirming and humane incarceration cultures. We recognize that the discourse about transgender people and incarceration may differ greatly around the world as a reflection of the legal and human rights protections that different nations uphold (Chiam, Duffy, & Gil, 2016; International Bar Association LGBTI Law Committee, 2015; Transgender Europe, 2017). Furthermore, transgender people are not a homogeneous group, and, like any other priority subpopulation in society, there is great diversity in expression of gender identities and other intersectional factors including sexual orientation, cultural, ethnic, religious/spiritual, class/socioeconomic status, and geographical backgrounds. Beyond the implementation of a holistic approach within incarceration settings, we also stress that incarceration settings are dependent upon support from the greater national criminal justice system,

correctional policies (including custodial, probation, parole and corporate) at state and federal levels, and from society at large. More specifically, while policies and procedures may be developed at the localized setting, transgender-specific management policies that are inspired by international human rights frameworks are central in setting the standard for individual correctional facilities as to what constitutes a gender-affirming, humane culture. Culturally- and clinically-competent policies that reflect international human rights law and practice from progressive governments would also provide incarceration settings sanctioned support to implement cultural change despite potential resistance from staff or other incarcerated people. Lastly, while we make suggestions for what an ideal incarceration setting may embody, we recognize the significance of placing this debate within the greater societal, medical, criminal justice, and political milieu. Most nations that allow gender marker change on legal documents do so with medical requirements that violate a transgender person's bodily integrity by requiring sterilization and extensive surgical intervention (Chiam et al., 2016; Human Rights Council, 2017). Likewise, many countries also require multiple psychiatric evaluations as a condition for their gender marker change on legal documents (Chiam et al., 2016). There are also strong currents of anti-transgender campaigners around the world, which actively fight against approaches to support and uphold the rights of incarcerated transgender people (Carroll & Mendos, 2017; Chiam et al., 2016; Human Rights Campaign, 2019). Similarly, pursuing research about incarcerated transgender people's lives, their experiences, and management by correctional authorities is tremendously difficult. As researchers in this space, we have experienced firsthand some of the difficulties in conducting research in incarcerated settings in both Australia and the US. We have faced challenges in obtaining appropriate permissions from research ethics committees and/or correctional institutions due to the perceived, controversial nature of such research (Adams et al., 2017; Apa et al., 2012; Mullens et al., 2019; Reiter, 2014; Schlosser, 2008). As well, some of the institutional barriers we have faced have been grounded in the incarceration systems' lack of familiarity with the research team, conflicting perspectives regarding research objectives and/or lack of willingness to "develop a collaborative research relationship" (Apa et al., 2012; Mullens et al., 2019; Schlosser, 2008; Watson & van der Meulen, 2018). Some of these institutional hurdles have been further embedded in an absence of mutual goals or incompatible methodologies of proposed studies due to the specific needs and culture present within correctional institutions, and potential fear of "exposure" resulting in possible negative press or institutional reviews (Apa et al., 2012; Mullens et al., 2019; Schlosser, 2008; Watson & van der Meulen, 2018). These barriers, in our experiences, have collectively restricted our access to incarcerated transgender people,



compounding their vulnerability by denying access to their stories being told and lived experiences shared. This opposition towards transparency on the part of correctional institutions can be very difficult for individual facilities and individuals for establishing a required evidence base needed to advocate for change. The current context of incarceration as experienced by transgender people clearly highlights the need for a whole-incarceration-setting approach, led and motivated by international human rights law and practice. Thinking through a visionary lens of what an inclusive, supportive, humane, and safe incarceration system would look like, we recommend the following suite of "best practice" strategies as a framework for implementing a whole-incarceration-setting approach. These recommendations emerged from the existing literature, including drawing on suggestions from other transgender health and rights scholars (Bartholomaeus & Riggs, 2017; Bouman et al., 2017; Dolovich, 2011; Jaffer et al., 2016; Sevelius & Jenness, 2017), organizations focused on protecting the wellbeing of incarcerated transgender people (American Civil Liberties Union [ACLU], 2014; Grant et al., 2011; International Commission of Jurists, 2007; James et al., 2016; Longo, 2017; Lydon et al., 2015; National Center for Transgender Equality, 2012, 2018a, 2018b; Newcomen, 2017; United Nations Office on Drugs & Crime, 2015); dialog with formerly incarcerated transgender people (Brömdal et al., 2019a; White Hughto et al., 2018), as well as staff and healthcare providers currently working in incarceration settings (Clark et al., 2017), and reflection upon our work as transgender rights and health scholars.

## Whole-incarceration-setting recommendations

### Philosophy and ethos

- Create transgender-supportive policies and standards of care in consultation with correctional staff at multiple levels (e.g., administration, correctional officers, healthcare) and with input from individuals outside the correctional setting, including transgender people, and experienced health professionals working with transgender people; communicate widely across the correctional setting; and ensure staff receive adequate and appropriate training on the proper implementation of policies and standards of care;
- Reinforce the attitude that transgender people's rights and health are important at all levels of the correctional setting through policies, action, and accountability, starting at the level of leadership;
- Incorporate recognition of diversity, specifically naming gender diversity in the incarceration setting's mission-and-values statement; and
- Implement "in-situ" written statements and visual signs and posters that recognize and support gender diversity in the philosophy and ethos of the institution.

### Policies, procedures, and guidelines

- Institute a case-by-case housing policy whereby transgender people are assessed individually for their housing assignment, taking into consideration the individual's gender identity and personal housing preference in conjunction with the individual's overall safety and security;
- Reassess housing policies at least twice per year to assure that housing circumstances are appropriate and that the individual has not faced abuse or harm based on the housing assignment, including being placed in "protective custody" and "administrative segregation";
- Provide the option, where relevant and desired by both parties, for a transgender person to be housed in the same cell or unit as another transgender individual or LGBTIQ+ (lesbian, gay, bisexual, transgender/gender diverse, intersex or queer) individual;
- Allow transgender people to access gender-specific clothing, grooming, hygiene, and commissary items, including undergarments consistent with their gender identity;
- Permit incarcerated transgender people to adopt the correct name and pronoun in accordance with their wishes;
- Conduct necessary pat-downs and strip searches only for a legitimate reason (e.g., to identify weapons or contraband) by a person of the same gender identity or whose gender aligns with the preference of the incarcerated individual. Absent an emergency, ensure that strip searches are only performed out of the view of other incarcerated people; and
- Provide showering facilities that protect the privacy of the transgender person, including the option of showering separately from other incarcerated people if they so choose.

### Complaints and allegations

- Swiftly and thoroughly investigate all allegations of transphobic bullying, harassment, sexual violence, and assault (by correctional staff or other incarcerated people);
- Ensure that there are multiple, clear, and safe means by which transgender individuals can report abuse, free from the fear of retaliation by other incarcerated people and correctional staff;
- Create and enforce appropriate repercussions for individuals who verbally, physically, and sexually abuse incarcerated transgender people in accordance with human rights recommendations; and
- Ensure case management for incarcerated transgender people are multidisciplinary and attended by all relevant people involved in the person's care.

### Provision of gender-affirming medical care

- Establish standards of healthcare for incarcerated transgender people in consultation with correctional healthcare providers, experts in transgender health, and current standards of care for the provision of gender-affirming medical and mental healthcare for transgender populations;
- Provide general and gender-affirming medical health-care (e.g., hormone therapy) to all incarcerated transgender people who require it, regardless of an individual's ability to document prior medical care or prescriptions;
- Ensure that mental health clinicians and correctional staff are properly trained and capable of providing culturally and clinically competent care to transgender patients;
- Safeguard continuity of care for transgender people between the community and incarceration to ensure that gender-affirming health service provision (e.g., access to hormones and dilators) is not interrupted; and
- Guarantee access to gender-affirming healthcare outside the correctional setting when there are insufficient staff and resources to provide adequate care to incarcerated transgender people within a given facility.

### Data and tracking

- Systematically and transparently record the number of incarcerated transgender people in accordance with confidentiality and privacy laws and regulations;
- Add questions assessing both sex assigned at birth and gender identity to intake forms and routinely collect these data; and
- Include correct gender identity, name, and pronouns, where appropriate, on all identification cards linked to the incarcerated transgender person.

### Language use

- Utilize the incarcerated transgender person's correct pronouns and name if safe to do so;
- Avoid language that misgenders incarcerated transgender people; and
- Respect and acknowledge cross-cultural concepts/practices and experiences of culturally different, gender-diverse communities and people.

### Resources and training

- Mandate transgender cultural competency training for everyone entering the incarceration setting, including other incarcerated people, correctional officers, healthcare providers, administrators, general staff, volunteers, trainees/interns, and those who are contractors, including court-appointed lawyers.

### Care and connection with the "outside" community

- Allow access to transgender community support groups, outside of the incarceration system, that offer diverse support in the form of newspapers; pen pal program; resource lists; and advocacy programs for incarcerated people; and
- Provide incarcerated transgender people with access to information regarding their legal rights and legal services to support them in responding to violations of their human and civil rights.

### Note

1. Appreciating the complexities in wrestling with the sensitivities of criminal justice language, The Marshall Project, a news organization that covers the criminal justice system, put out a call in 2015 to its audience on what to call incarcerated people. The majority of the 200 respondents, 38%, many of whom had also served time, were in favor of the terminology "incarcerated person." As such, it is a conscious decision on our part to use the nomenclature "incarcerated" when we refer to transgender people who have lived experiences at various stages of the incarceration process (The Marshall Project, 2015).

### Acknowledgements

The authors would like to acknowledge the feedback of Gina Mather, President, and Kristine Johnson, Secretary, of the Australian Transgender Support Association of Queensland Inc. (ATSAQ) for reviewing and endorsing the editorial and the whole-incarceration-setting recommendations guiding the spirit of the editorial.

### Declaration of interest

The authors report no conflict of interest. The authors alone are responsible for the content and writing of this paper.

Annette Brömdal
School of Education, Faculty of Business, Education, Law and Arts, Centre for Health, Informatics and Economic Research, Institute for Resilient Regions, University of Southern Queensland, Toowoomba, Queensland, Australia
 Annette.Bromdal@usq.edu.au

Kirsty A. Clark
Department of Social and Behavioral Sciences, Yale School of Public Health, Yale University, New Haven, CT, USA

Jaclyn M.W. Hughto
Departments of Behavioral and Social Sciences and Epidemiology, Brown School of Public Health, Center for Health Equity Research, Brown University, Providence, RI, USA

Joseph Debattista
Metro North Public Health Unit, Metro North Hospital & Health Service, Brisbane, Queensland, Australia

Tania M. Phillips
Centre for Health, Informatics and Economic Research, Institute for Resilient Regions, University of Southern Queensland, Queensland, Australia

Amy B. Mullens
School of Psychology and Counselling, Faculty of Health, Engineering and Sciences, Centre for Health, Informatics and Economic Research, Institute for Resilient Regions, University of Southern Queensland, Ipswich, Queensland, Australia
School of Psychology and Counselling, Faculty of Health, Queensland University of Technology, Kelvin Grove, Queensland, Australia

Jeff Gow
School of Commerce, Faculty of Business, Education, Law and Arts, University of Southern Queensland, Toowoomba, Queensland, Australia
School of Accounting, Economics and Finance, University of KwaZulu-Natal, Durban, South Africa

Kirstie Daken
School of Psychology and Counselling, Faculty of Health, Engineering and Sciences, Centre for Health, Informatics and Economic Research, Institute for Resilient Regions, University of Southern Queensland, Ipswich, Queensland, Australia

## ORCID

Annette Brömdal ⓘ http://orcid.org/0000-0002-1307-1794
Amy B. Mullens ⓘ http://orcid.org/0000-0002-0939-9842

## References

Adams, N., Pearce, R., Veale, J., Radix, A., Castro, D., Sarkar, A., & Thom, K. C. (2017). Guidance and ethical considerations for undertaking transgender health research and institutional review boards adjudicating this research. *Transgender Health*, 2(1), 165–175. doi:10.1089/trgh.2017.0012

American Civil Liberties Union [ACLU]. (2014). Prison rape elimination act (PREA) toolkit: End the abuse-protecting LGBTI prisoners from sexual assault. Retrieved from https://www.aclu.org/sites/default/files/assets/012714-prea-combined.pdf

Anthony, T. (2017). FactCheck Q&A: Are indigenous Australians the most incarcerated people on Earth? *The Conversation*. Retrieved https://theconversation.com/factcheck-qanda-are-indigenous-australians-the-most-incarcerated-people-on-earth-78528

Apa, Z. L., Bai, R. Y., Mukherejee, D. V., Herzig, C. T. A., Koenigsmann, C., Lowy, F. D., & Larson, E. L. (2012). Challenges and strategies for research in prisons. *Public Health Nursing*, 29(5), 467–472. doi:10.1111/j.1525-1446.2012.01027.x

Atabay, T. (2009). *Handbook on prisoners with special needs*. Vienna: United Nations Office of Drugs and Crime.

Australian Institute of Health and Welfare. (2019). The health of Australia's prisoners 2018. Retrieved from https://www.aihw.gov.au/getmedia/2e92f007-453d-48a1-9c6b-4c9531cf0371/aihw-phe-246.pdf.aspx?inline=true

Bartholomaeus, C., & Riggs, D. W. (2017). Whole-of-school approaches to supporting transgender students, staff, and parents. *International Journal of Transgenderism*, 18(4), 361–366. doi:10.1080/15532739.2017.1355648

Beard, J. (2018). Transgender prisoners. Retrieved from https://researchbriefings.parliament.uk/ResearchBriefing/Summary/CBP-7420

Blight, J. (2000). Transgender inmates: Trends and issues in crime and criminal justice (168). Retrieved from http://aic.gov.au/media_library/publications/tandi_pdf/tandi168.pdf

Bonczar, T. P. (2003). *Prevalence of imprisonment in the US population, 1974-2001*. Washington, DC: US Department of Justice, Office of Justice Programs

Bouman, W. P., Schwend, A. S., Motmans, J., Smiley, A., Safer, J. D., Deutsch, M. B., … Winter, S. (2017). Language and trans health. *International Journal of Transgenderism*, 18(1), 1–6. doi:10.1080/15532739.2016.1262127

Brömdal, A., Mullens, A. B., Phillips, T. M., Gildersleeve, J., Du Plessis, C., Debattista, J., … Gow, J. (2019a). *The lived experiences of formerly incarcerated transgender people in Australia*. Unpublished manuscript.

Brömdal, A., Mullens, A. B., Phillips, T. M., & Gow, J. (2019b). Experiences of transgender prisoners and their knowledge, attitudes, and practices regarding sexual behaviors and HIV/STIs: A systematic review. *International Journal of Transgenderism*, 20(1), 4–20. doi:10.1080/15532739.2018.1538838

Brown, G. R. (2010). Autocastration and autopenectomy as surgical self-treatment in incarcerated persons with gender identity disorder. *International Journal of Transgenderism*, 12(1), 31–39. doi:10.1080/15532731003688970

Brown, G. R. (2014). Qualitative analysis of transgender inmates' correspondence: Implications for departments of. *Journal of Correctional Health Care*, 20(4), 334–342. doi:10.1177/1078345814541533

Butler, T., Richters, J., Yap, L., Papanastasiou, C., Richards, A., Schneider, K., … Donovan, B. (2010). Sexual health and behaviour of Queensland prisoners: With Queensland and New South Wales comparisons. Retrieved from https://www.researchgate.net/publication/237843221_Sexual_health_and_behaviour_of_Queensland_prisoners_With_Queensland_and_New_South_Wales_comparisons

Carroll, A., & Mendos, L. R. (2017). State sponsored homophobia 2017: A world survey of sexual orientation laws: Criminalisation, protection and recognition. Retrieved from https://www.ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf

Castagnoli, C. (2010). Transgender persons' rights in the EU member states. Brussels: European, Parliament, Directorate-General

For Internal Policies, Policy Department Citizens' Rights and Constitutional Affairs. Retrieved from http://www.europarl.europa.eu/RegData/etudes/note/join/2010/425621/IPOL-LIBE_NT(2010)425621_EN.pdf

Chiam, Z., Duffy, S., & Gil, M. G. (2016). *Trans legal mapping report: Recognition before the law*. Geneva: ILGA.

Clark, K. A., White Hughto, J. M., & Pachankis, J. E. (2017). What's the right thing to do?" Correctional healthcare providers' knowledge, attitudes and experiences caring for transgender inmates. *Social Science & Medicine*, 193, 80–89. doi:10.1016/j.socscimed.2017.09.052

Coleman, E., Bockting, W., Botzer, M., Cohen-Kettenis, P., DeCuypere, G., Feldman, J., … Zucker, K. (2012). Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *International Journal of Transgenderism*, 13(4), 165–232. doi:10.1080/15532739.2011.700873

Dolovich, S. (2011). Strategic segregation in the modern prison. *American Criminal Law Review*, 48(1), 1–110.

Edney, R. (2004). To keep me safe from harm-transgender prisoners and the experience of imprisonment. *Deakin Law Review*, 9(2), 328–338. doi:10.21153/dlr2004vol9no2art247

Enggist, S., Møller, L., Galea, G., & Udesen, C. (Eds.). (2014). *Prisons and health*. Copenhagen: World Health Organization.

Erni, J. N. (2013). Legitimating transphobia: The legal disavowal of transgender rights in prison. *Cultural Studies*, 27(1), 136–159. doi:10.1080/09502386.2012.722305

Garofalo, R., Deleon, J., Osmer, E., Doll, M., & Harper, G. W. (2006). Overlooked, misunderstood and at-risk: Exploring the lives and HIV risk of ethnic minority male-to-female transgender youth. *Journal of Adolescent Health*, 38(3), 230–236. doi:10.1016/j.jadohealth.2005.03.023

Gatherer, A., Atabay, T., & Hariga, F. (2014). Prisoners with special needs. In S. Enggist, L. Møller, G. Galea, & C. Udesen (Eds.), *Prisons and health* (pp. 151–158). Copenhagen: World Health Organization.

Glaze, L. E., & Kaeble, D. (2014). Correctional populations in the United States, 2013. Retrieved from https://bjs.gov/content/pub/pdf/cpus13.pdf

Glezer, A., McNiel, D. E., & Binder, R. L. (2013). Transgendered and incarcerated: A review of the literature, current policies and laws, and ethics. *Journal of the American Academy of Psychiatry and the Law Online*, 41(4), 551.

Gorden, C., Hughes, C., Roberts, D., Astbury-Ward, E., & Dubberley, S. (2017). A literature review of transgender people in prison: An 'invisible' population in England and Wales. *Prison Service Journal*, 233, 11–22.

Grant, J. M., Mottet, L., Tanis, J. E., Harrison, J., Herman, J., & Keisling, M. (2011). *Injustice at every turn: A report of the national transgender discrimination survey*. Washington, DC: National Center for Transgender Equality.

Hagner, D. (2010). Fighting for our lives: The D.C. trans coalition's campaign for humane treatment of transgender inmates in District of Columbia correctional facilities. *Georgetown Journal of Gender & the Law*, 11(3), 837–867.

Holman, C. W., & Goldberg, J. M. (2006). Social and medical transgender case advocacy. *International Journal of Transgenderism*, 9(3-4), 197–217. doi:10.1300/J485v09n03_09

Human Rights Campaign. (2019). House judiciary committee right to advance VAWA without anti-transgender amendment. Retrieved from https://www.hrc.org/press/hrc-house-judiciary-committee-right-to-advance-vawa

Human Rights Council (2017). *Report of the Independent Expert on protection against violence and discrimination based on sexual orientation and gender identity* (A/HRC/35/36). Retrieved from https://www.ohchr.org/Documents/Issues/SexualOrientation/A_HRC_35_36.docx

International Bar Association LGBTI Law Committee. (2015). Mr & Ms X: The rights of transgender persons globally (research digest). Retrieved from https://www.ibanet.org/Document/Default.aspx?DocumentUid=17DF4B83-2209-4EF8-BBF7-9C8C163AF15E

International Commission of Jurists. (2007). Yogyakarta Principles - Principles on the application of international human rights law in relation to sexual orientation and gender identity. Retrieved from http://www.yogyakartaprinciples.org/wp/wp-content/uploads/2016/08/principles_en.pdf

Jaffer, M., Ayad, J., Tungol, J. G., Macdonald, R., Dickey, N., & Venters, H. (2016). Improving transgender healthcare in the New York City correctional system. *LGBT Health*, 3(2), 116–121. doi:10.1089/lgbt.2015.0050

James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). *The report of the 2015 U.S. Transgender Survey*. Washington, DC: National Center for Transgender Equality.

Jenness, V., & Fenstermaker, S. (2016). Forty years after Brownmiller: Prisons for men, transgender inmates, and the rape of the feminine. *Gender & Society*, 30(1), 14–29. doi:10.1177/0891243215611856

Joint United Nations Programme on HIV/AIDS [UNAIDS]. (2014). Services for people in prisons and other closed settings. Retrieved from http://www.unaids.org/sites/default/files/media_asset/2014_guidance_servicesprisonsettings_en.pdf

Joint United Nations Programme on HIV/AIDS [UNAIDS]. (2015). UNAIDS terminology guidelines. Retrieved from http://www.unaids.org/en/resources/documents/2015/2015_terminology_guidelines

Lamble, S. (2012). Rethinking gendered prison policies: Impacts on transgender prisoners. *ECAN Bulletin*, 16, 7–12.

Lara, A. (2010). Forced integration of gay, bisexual and transgendered inmates in California state prisons: From protected minority to exposed victims. *Southern California Interdisciplinary Law Journal*, 19(3), 589–614.

Lobel, J. (2008). Prolonged solitary confinement and the constitution. *Journal of Constitutional Law*, 11(1), 115–138.

Longo, C. (2017). Justice and community safety policy brief: Transgender rights in public prisons. Retrieved from https://www.siena.edu/files/resources/transgender-rights-in-public-prisons.pdf

Lydon, J., Carrington, K., Low, H., Miller, R., & Yazdy, M. (2015). Coming out of concrete closets: A report on black & pink's national LGBTQ prisoner survey. Retrieved from http://www.blackandpink.org/wp-content/upLoads/Coming-Out-of-Concrete-Closets.-Black-and-Pink.-October-21-2015.pdf

Lynch, S., & Bartels, L. (2017). Transgender prisoners in Australia: An examination of the issues, law and policy. *Flinders Law Journal*, 19(2), 185–231.

Malkin, M. L., & DeJong, C. (2018). Protections for transgender inmates under PREA: A comparison of state correctional policies in the United States. *Sexuality Research and Social Policy*. doi:10.1007/s13178-018-0354-9

Mann, R. (2006). The treatment of transgender prisoners, not just an American Problem. A comparative analysis of American, Australian, and Canadian prison policies concerning the treatment of transgender prisoners and universal recommendation to improve treatment. *Law Sexuality: Review of Lesbian, Gay, Bisexual, and Transgender Legal Issues*, 15, 91–134.

Markshamer, J., & Tobin, H. J. (2014). Standing with LGBT prisoners: An advocate's guide to ending abuse and combating imprisonment. Retrieved from https://transequality.org/sites/default/files/docs/resources/JailPrisons_Resource_FINAL.pdf

Ministry of Justice, National Offender Management Service, HM Prison Service, & Her Majesty's Prison and Probation Service. (2017). *Prison population figures:* Retrieved from https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/665904/prison-pop-november-2017.rtf

Mintz, J. E. (2013). Treatment of transgender inmates—The double punishment. *Law School Student Scholarship*, *271*, 1–31.

Mullens, A. B., Brömdal, A., Debattista, J., Daken, K., Phillip, T., & Gow, J. (2019). *Navigating the methodological and ethical landmines of transgender research in incarceration settings*. Unpublished manuscript.

National Center for Transgender Equality. (2012). LGBT people and the prison rape elimination act. Retrieved from http://www.transequality.org/sites/default/files/docs/resources/PREA_July2012.pdf

National Center for Transgender Equality. (2018a). LGBTQ people behind bars: A guide to understand the issues facing transgender prisoners and their legal rights. Retrieved from https://transequality.org/sites/default/files/docs/resources/TransgenderPeopleBehindBars.pdf

National Center for Transgender Equality. (2018b). Ending abuse of transgender prisoners: A guide to winning policy change in jails and prisons. Retrieved from https://transequality.org/sites/default/files/docs/resources/EndingAbuseofTransgenderPrisoners.pdf

Nemoto, T., Bödeker, B., & Iwamoto, M. (2011). Social support, exposure to violence and transphobia, and correlates of depression among male-to-female transgender women with a history of sex work. *American Journal of Public Health*, *101*(10), 1980–1988. doi:10.2105/AJPH.2010.197285

Newcomen, N. (2017). Learning lessons bulletin: Transgender prisoners. Retrieved from https://s3-eu-west-2.amazonaws.com/ppo-dev-storage-4dvljl6iqfyh/uploads/2017/01/PPO-Learning-Lessons-Bulletin_Transgender-prisoners_Final_WEB_Jan-17.pdf

Office of the United Nations High Commissioner for Human Rights. (2007). Selected decisions of the committee against torture: Convention against torture and other cruel, inhuman or degrading treatment or punishment. In *Eleventh to thirty-eighth sessions (November 1993 - May 2007)* (Vol. 1). New York, NY: Office of the United Nations High Commissioner for Human Rights.

Oparah, J. C. (2012). Feminism and the (trans)gender entrapment of gender nonconforming prisoners. *UCLA Women's Law Journal*, *18*(2), 239–271.

Peek, C. (2004). Breaking out of the prison hierarchy: Transgender prisoners, rape, and the eighth amendment. *Santa Clara Law Review*, *44*, 1211–1248.

Perkins, R. (1991). Transsexuals in prison. *Journal of Social Justice Studies*, *4*, 97–100.

Phillips, R., Brömdal, A., Mullens, A., Gildersleeve, J., Gow, J. (In Press). We don't recognise transexuals … and we're not going to treat you": Cruel and unusual and the lived experiences of transgender women in US prisons. In M. K., Harmes, M. A., Harmes, & B. Harmes (Eds.), *The Palgrave handbook of incarceration across popular media*. London: Palgrave Macmillan. In Press.

Poole, L., Whittle, S., & Stephens, P. (2002). Working with transgendered and transsexual people as offenders in the probation service. *Probation Journal*, *49*(3), 227–232. doi:10.1177/02645505020490306

Quinn, D. M., & Earnshaw, V. A. (2013). Concealable stigmatized identities and psychological well-being. *Social and Personality Psychology Compass*, *7*(1), 40–51. doi:10.1111/spc3.12005

Reisner, S. L., Bailey, Z., & Sevelius, J. (2014). Racial/ethnic disparities in history of incarceration, experiences of victimization, and associated health indicators among transgender women in the US. *Women & Health*, *54*(8), 750–767. doi:10.1080/03630242.2014.932891

Reiter, K. (2014). Making windows in walls: Strategies for prison research. *Qualitative Inquiry*, *20*(4), 417–428. doi:10.1177/1077800413515831

Richters, J., Butler, T., Yap, L., Kirkwood, K., Grant, L., Smith, A., … Donovan, B. (2008). Sexual health and behaviour of New South Wales prisoners. Retrieved from https://sphcm.med.unsw.edu.au/sites/default/files/sphcm/Research/Sexual_Health_NSW_Prisoners.pdf

Rosenberg, R., & Oswin, N. (2015). Trans embodiment in carceral space: Hypermasculinity and the US prison industrial complex. *Gender Place and Culture*, *22*(9), 1269–1286. doi:10.1080/0966369X.2014.969685

Routh, D., Abess, G., Makin, D., Stohr, M. K., Hemmens, C., & Yoo, J. (2017). Transgender inmates in prisons: A review. *International Journal of Offender Therapy and Comparative Criminology*, *61*(6), 645–666. doi:10.1177/0306624X15603745

Schlosser, J. A. (2008). Issues in interviewing inmates: Navigating the methodological landmines of prison research. *Qualitative Inquiry*, *14*(8), 1500–1525. doi:10.1177/1077800408318325

Scott, S. (2013). One is not born, but becomes a woman": A fourteenth amendment argument in support of housing male-to-female transgender inmates in female facilities. *University of Pennsylvania Journal of Constitutional Law*, *15*(4), 1259–1297. Retrieved from https://heinonline.org/HOL/P?h=hein.journals/upjcl15&i=1279

Scottish Prison Service [SPS]. (2019). SPS prison population. Retrieved from http://www.sps.gov.uk/nmsruntime/saveasdialog.aspx?lID=4265&sID=629

Sevelius, J., & Jenness, V. (2017). Challenges and opportunities for gender-affirming healthcare for transgender women in prison. *International Journal of Prisoner Health*, *13*(1), 32–40. doi:10.1108/IJPH-08-2016-0046

Shalev, S. (2014). Solitary confinement as a prison health issue. In S. Enggist, L. Møhller, G. Galea, & C. Udesen (Eds.), *Prisons and health* (pp. 27–35). Copenhagen: World Health Organization.

Sumner, J., & Sexton, L. (2015). Lost in translation: Looking for transgender identity in women's prisons and locating aggressors in prisoner culture. *Critical Criminology*, *23*(1), 1–20. doi:10.1007/s10612-014-9243-6

Sumner, J., & Sexton, L. (2016). Same difference: The 'dilemma of difference' and the incarceration of transgender prisoners. *Law & Social Inquiry*, *41*(3), 616–642. doi:10.1111/lsi.12193

Tarzwell, S. (2006). The gender liens are marked with razor wire: Addressing state prison policies and practices for the management of transgender prisoners. *Columbia Human Rights Law Review*, *38*(167), 167–219.

Taylor, P. (2018). Scots prisons to consult on changes to transgender policy. Retrieved from https://theferret.scot/change-in-policy-on-transgender-people-in-prison/

The Marshall Project (2015). "Inmate. Prisoner. Other. Discussed." What to call incarcerated people: Your feedback. Retrieved from https://www.themarshallproject.org/2015/04/03/inmate-prisoner-other-discussed

Transgender Europe. (2017). Trans rights Europe map & index 2017. Retrieved from https://tgeu.org/trans-rights-map-2017/

United Nations Office on Drugs and Crime (2015). *The United Nations standard minimum rules for the treatment of prisoners (the Nelson Mandela rules)*. Vienna: Unodc.

US Department of Justice. (2012). National standards to prevent, detect, and respond to prison rape: Final rule. Retrieved from https://www.govinfo.gov/content/pkg/FR-2012-06-20/pdf/2012-12427.pdf.

von Dresner, K. S., Underwood, L. A., Suarez, E., & Franklin, T. (2013). Providing counseling for transgendered inmates: A survey of correctional services. *International Journal of Behavioral Consultation and Therapy*, *7*(4), 38.

Watson, T. M., & van der Meulen, E. (2018). Research in carceral contexts: Confronting access barriers and engaging former prisoners. *Qualitative Research*, *19*(2), 182–198. doi:10.1177/1468794117753353

White Hughto, J. M., Clark, K. A., Altice, F. L., Reisner, S. L., Kershaw, T. S., & Pachankis, J. E. (2018). Creating, reinforcing, and resisting the gender binary: A qualitative study of

transgender women's healthcare experiences in sex-segregated jails and prisons. *International Journal of Prisoner Health*, *14*(2), 69–88. doi:10.1108/IJPH-02-2017-0011

Wilson, M., Simpson, P. L., Butler, T. G., Yap, L., Richters, J., & Donovan, B. (2017). You're a woman, a convenience, a cat, a poof, a thing, an idiot': Transgender women negotiating sexual experiences in men's prisons in Australia. *Sexualities*, *20*(3), 380–402. doi:10.1177/1363460716652828

Wolff, K. B., & Cokely, C. L. (2007). To protect and to serve?": An exploration of police conduct in relation to the gay, lesbian, bisexual, and transgender community. *Sexuality and Culture*, *11*(2), 1–23. doi:10.1007/s12119-007-9000-z

World Health Organization. (1986). *Ottawa Charter for Health Promotion* (WHO/HPR/HEP/95.1 Geneva). Paper presented at the First International Conference on Health Promotion, Ottawa, November 21, 1986.

World Health Organization. (2016). Consolidated guidelines on HIV prevention, diagnosis, treatment and care for key populations–2016 update. Retrieved from http://apps.who.int/iris/bitstream/10665/246200/1/9789241511124-eng.pdf

Yap, L., Richters, J., Butler, T., Schneider, K., Grant, L., & Donovan, B. (2011). The decline in sexual assaults in men's prisons in New South Wales: A "systems" approach. *Journal of Interpersonal Violence*, *26*(15), 3157–3181. doi:10.1177/0886260510390961