RAÚL R. LABRADOR
ATTORNEY GENERAL

JAMES E. M. CRAIG, ISB #6365
Chief, Civil Litigation and
Constitutional Defense

JAMES J. SIMERI, ISB #12332
GREGORY E. WOODARD, ISB #11329
MATTHEW L. MAURER, ISB #12575
Deputy Attorneys General
Office of the Attorney General
P. O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
james.craig@ag.idaho.gov
james.simeri@ag.idaho.gov
greg.woodard@ag.idaho.gov
matthew.maurer@ag.idaho.gov

*Attorneys for Defendants Raúl Labrador, in his official capacity as Attorney General of the State of Idaho; Brad Little, in his official capacity as Governor of the State of Idaho, Josh Tewalt, in his official capacity as the Director of the Idaho Department of Corrections; and Bree Derrick, in her official capacity as the Deputy Director of IDOC*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| JANE ROE, et al.<br><br>       *Plaintiffs,*<br><br>  v.<br><br>RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho; et al.<br><br>       *Defendants.* | Case No. 1:24-cv-00306-CWD<br><br>**STATE DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TRO, CLASS CERTIFICATION, AND PRELIMINARY INJUNCTION** |

Medical professionals know dramatically more about the use of cross-sex hormones and sex-reassignment surgeries today than anyone knew even just five years ago. At that time, long-term and reliable studies had not been done. Such treatments were a new frontier spurred by modern concepts of autonomy and self-determination. And while gender dysphoria itself wasn't a new mental disorder—it had long been recognized in the Diagnostic and Statistical Manual of Mental Disorders—treating it professionally in a way that "affirmed" the dysphoria was relatively new. Neither the medical profession nor its governmental regulators were prepared to address the ethical and physiological questions raised by this novel branch of medicine. But today, the science is starting to pour in, and the alarms are starting to sound. That's why, for example, European nations are halting use of the treatments for minors.

This past legislative session, the Idaho Legislature also weighed in on the experimental treatments and determined that that cross-sex hormones and sex-reassignment surgery "carry substantial risks and have known harmful effects, including irreversible physical alterations and, in some cases, sterility and lifelong sexual dysfunction." *See* HB 668 § 1. Accordingly, it enacted Idaho Code § 18-8901, which became effective on July 1. The statute prohibits the use of state funds, state facilities, or state-employed physicians for an enumerated list of treatments—including cross-sex hormones and various types of surgery—when the treatments are used to alter an individual's appearance and "affirm the individual's perception of the

STATE DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TRO, CLASS CERTIFICATION, AND PRELIMINARY INJUNCTION — 1

individual's sex in a way that is inconsistent with the individual's biological sex." Idaho Code §§ 18-1506C(3), 18-8901(2).

Plaintiffs are prisoners in the custody of the Idaho Department of Corrections. They claim that this statute violates the Eighth Amendment prohibition against cruel and unusual punishment because it denies them medically necessary treatment. They seek a TRO or preliminary injunction barring enforcement.

But Plaintiffs have supported their motion with only their own testimony, mostly about how they feel, and a purported expert who is not even a medical doctor. This motion presents one overriding question: When the Idaho legislature enacts a statute based on its determinations about the risks and harmful effects of a medical treatment, should a Court enjoin that statute's enforcement without any medical evidence at all? State Defendants contend that the answer must be "no." Therefore, State Defendants request that the Court deny Plaintiffs' motion for TRO, preliminary injunction, and provisional class certification.

## I. Plaintiffs Are Not Likely to Succeed on the Merits

To obtain a TRO or a preliminary injunction, Plaintiffs must establish that they are likely to succeed on the merits. Plaintiffs have not made this showing. To prevail on their claim, Plaintiffs must show that the course of treatment the doctors chose was medically unacceptable. *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016). But Plaintiffs cannot do that here because in enacting the statue, Idaho has decided what is medically necessary.

***The Idaho Legislature Has the Power to Regulate Medical Treatment.***

A state violates the prohibition on "cruel and unusual punishment" if it is "deliberate[ly] indifferen[t] to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[T]o show deliberate indifference, the plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to the plaintiff's health." *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) (cleaned up). In other words, a treatment must be "medically necessary" for its denial to possibly amount to deliberate indifference. *Rosati v. Igbinoso*, 791 F.3d 1037, 1040 (9th Cir. 2015).

In enacting § 18-8901, the Idaho Legislature's intent was to protect the public from medical treatments including cross-sex hormones and various types of surgery that "carry substantial risks and have known harmful effects, including irreversible physical alterations and, in some cases, sterility and lifelong sexual dysfunction." *See* HB 668 § 1. Plaintiffs may disagree with the legislature's policy choice. But the Legislature is well within its purview to enact legislation that regulates medical treatment.

The Ninth Circuit has held, albeit in a different context, that states have the power to regulate medical treatment. For example, in *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014), California enacted a law that banned mental-health providers from providing "sexual orientation change efforts" with clients who are minors. *Id.* at 1215. The plaintiffs were mental health-providers who wanted to provide this therapy, and

parents of children who wanted to receive it. They challenged the statute as a violation of their free-speech rights under the First Amendment. The Ninth Circuit held that the statute did not violate the First Amendment. Of relevance here, the court stated, "Pursuant to its police power, California has authority to regulate licensed mental health providers' administration of therapies that the legislature has deemed harmful." *Id.* at 1229.

The Ninth Circuit reached a similar conclusion in *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022). In that case, Washington banned conversion therapy. In holding that the ban did violate the free-exercise clause of the First Amendment, the Court noted the legislature's purpose in enacting the statute: "protecting its minors against exposure to the serious harms caused by conversion therapy." *Id.* at 1078. The Court held that Washington has a "compelling interest in the practice of professions within its boundaries." *Id.* at 1078.

Consistent with these cases, § 18-8901 is a valid exercise of Idaho's power to regulate medical treatment. Once Idaho enacted this statute, as to cross-sex hormones and cross-sex surgery, we are no longer in a situation where the Court evaluates competing testimony about what the standard of care should be. In § 18-8901, Idaho set the standard of care.

***Plaintiffs rely on WPATH, which is not reliable.*** Plaintiffs rely on WPATH as the standard. But WPATH has been discredited and exposed as a pseudoscientific advocacy organization promoting social and political activism. This is problematic for Plaintiffs because their arguments rely entirely on WPATH and WPATH's standards

of care, which were driven by financial motives and influenced by a political agenda. (Ex. A, Decl. Cantor ¶¶ 329-36; Ex. B, Decl. Laidlaw ¶¶ 219-33).

*Plaintiffs' Evidence Is Insufficient.* First, and most importantly, this Court has no evidence before it from a medical doctor who has personally evaluated Plaintiffs. The Court has only the expert declaration from one Dr. Ettner and Plaintiffs' subjective descriptions of symptoms they have experienced. Dr. Ettner is not a medical doctor and does not have expertise in endocrinology. And again, she has not evaluated any of the Plaintiffs, and cannot connect any of the opinions in her declaration to the facts in this case. Similarly, Plaintiffs are not medical doctors either. While they can describe their own symptoms, they cannot connect those symptoms with gender dysphoria and they cannot project the consequences of tapering down their hormone treatment. In short, Plaintiffs cannot demonstrate that hormone treatment is medically necessary, or that denying it amounts to conscious disregard of an excessive risk to their health.

For example, Plaintiff Doe's declaration describes an episode when Doe was arrested in 2023 and unable to access hormone treatments for an undisclosed time. (Decl. Doe; Doc. 2-3 ¶ 12). This was described as a complete break from hormones, not a tapering-down, as is contemplated by § 18-8901 of the Idaho Code. But Doe cannot connect the effects he described to the break in hormone treatment, as Doe attempts to do. (*Id.*) Plaintiff Doe does not have medical expertise. This Court cannot properly accept a plaintiff's lay opinion about what treatments are medically

necessary, especially when this is the central issue the Court must decide on this motion.

Similarly, Plaintiff Poe's declaration describes an episode where Poe had a complete break from hormone treatment for an undisclosed time. Poe compared the effects of the break in hormone treatment to the effects of stopping diazepam. (Decl. Poe; Doc. 2-4 ¶ 18). Plaintiff Poe is not a medical professional, nor are any of the Plaintiffs. What Plaintiffs are asking this Court to accept is essentially guesswork. Does stopping diazepam pose excessive risk to Plaintiff Poe's health? Do diazepam withdrawal symptoms analogize to symptoms resulting from hormone cessation? How does this bear on whether hormone treatment is medically necessary? How does it bear on whether denial of hormone treatment would be a conscious disregard of an excessive risk to Plaintiffs' health? Plaintiffs' evidence answers none of these questions. One can have sympathy for their mental-health issues, while still recognizing their limited ability to self-diagnose and project medical outcomes.

Plaintiffs' evidence does not even attempt to offer objective answers to important questions above. In other words, there is no objective evidence. There is no evidence from a medical doctor who has examined Plaintiffs. Had there been a medical evaluation of each Plaintiff, with objective facts about the effects of tapering off hormone treatment, Defendants could have gotten second opinions or otherwise contested the medical evidence if appropriate. But we needn't reach that step. Plaintiffs offered no medical evidence. Instead, they offered only their subjective

descriptions of symptoms, which cannot be controverted or disproven with any amount of evidence.

***State Defendants' Experts Discredit Plaintiffs' Weak Evidence.*** Evidence-based medical standards are woefully deficient in Plaintiffs' filings. The standards of care Plaintiffs' expert cites to, and the "medically necessary" treatments recommended by those standards, are the product of a highly ideological organization, overtly influenced by financial interests and politics. The World Professional Association of Transgender Health ("WPATH"), an organization to which Plaintiffs' expert, Dr. Ettner, is inextricably tied, has been discredited and exposed as a pseudoscientific advocacy organization promoting social and political activism. (Ex. B, Decl. Laidlaw ¶¶ 165-83). WPATH's Standards of Care, version 8, ("SOC 8"), which Dr. Ettner repeatedly references throughout her expert declaration, are not the product of evidence-based medicine. They are financially motivated. They are politically influenced. They are, in a word, unreliable. (Ex. A, Decl. Cantor ¶ 122; Ex. B, Decl. Laidlaw ¶ 233).

Similarly, Dr. Ettner's declaration is unreliable. Its heavy reliance upon WPATH and SOC 8 is problematic for the reasons noted above. Additionally, she relies on outdated and obsolete clinical materials, as well as a blog post, which she refers to as a published literature review. Most concerning, Dr. Ettner ventures beyond her qualifications, offering medical warnings ostensibly based on her own expertise, despite the fact she is not a medical doctor. (*See generally* Ex. A, Decl. Cantor ¶¶ 434-42).

Dr. Ettner's warnings about the purported effects of withdrawing cross-sex hormone treatment from Plaintiffs are most problematic. As an initial matter, it is important to dispel her misrepresentation that § 18-8901 requires an "abrupt cessation of treatment" for Plaintiffs' gender dysphoria. It does no such thing. Plaintiff Poe's own declaration contradicts this false narrative of an "abrupt cessation" in treatment. (Decl. Poe; Doc. 2-4 ¶ 16) ("I was told I would be tapered off my hormone therapy."). Rather, the treatments would be tapered off in a medically responsible manner to avoid health risks *medical doctors* would expect to result from a sudden stop. Dr. Ettner is not a medical doctor. She is not an endocrinologist, and she has not personally evaluated any of the Plaintiffs. Her assertions about the "predictable and dire" consequences of implementing H.B. 668 should be given no weight. (Ex. B, Decl. Laidlaw ¶¶ 281-95).

## II. The Plaintiffs Will Not Suffer Irreparable Injury Absent an Injunction

Plaintiffs seeking preliminary relief must demonstrate that irreparable injury is likely in the absence of an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). In addition to showing a likelihood of irreparable injury, a plaintiff must show a "sufficient causal connection" between the alleged injury and the conduct sought to be enjoined. *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011).

Plaintiffs say, conclusorily, that they will suffer irreparable injury absent an injunction because the medically necessary care that they currently receive to treat their gender dysphoria will be discontinued. (Mem. Supp. Mot. TRO; Doc. 2-1 at 14). For two reasons, however, this argument fails.

***No Evidence to Establish Irreparable Injury.*** First, Plaintiffs have not submitted evidence sufficient to establish irreparable injury. Under Rule 65(b)(1)(A), evidence is not optional. It is mandatory. As discussed *supra*, in part I, the purported evidence that Plaintiffs submit is not adequate. Plaintiffs offered their own declarations about the symptoms they say they have experienced, and their own desires for cross-gender hormones. But Plaintiffs are not medical doctors. Their subjective testimony about their own symptoms, and their own desires for cross-gender hormones, is not a substitute for an actual medical diagnosis that establishes irreparable injury.

And while Plaintiffs also submitted the declaration of a purported expert, Dr. Randi C. Ettner, she is not a medical doctor. (Decl. Ettner; Doc. 2-5 ¶ 1). Moreover, she does not say that she examined the Plaintiffs, or even reviewed the Plaintiffs' medical records. She does not mention Plaintiffs at all. This is not evidence sufficient to establish that absent an injunction, these Plaintiffs in this case will suffer irreparable injury by being denied medically-necessary care.

Plaintiffs appear to rely on *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019), to support their factual claim that without an injunction, Plaintiffs will suffer irreparable injury. (Mem. Supp. Mot. TRO; Doc. 2-1 at 14). In *Edmo*, the plaintiff prisoner alleged violations of his Eighth-Amendment rights when the defendant denied his request for cross-gender surgery. The trial court granted an injunction ordering the surgery, and the Ninth Circuit affirmed.

But the Court's factual findings in *Edmo* as to that plaintiff in that case do not somehow bind this Court's factual determinations as to these Plaintiffs. *Edmo* was based on factual conclusions regarding that plaintiff, and that plaintiff only. Furthermore, in *Edmo*, the defendants agreed that the WPATH Standards of Care was the appropriate benchmark for treatment of gender dysphoria. 935 F.3d at 767. State Defendants now reject the WPATH Standards of Care as the appropriate benchmark. *See* pg. 4, *supra*. In opposition to this motion, they have offered their own expert testimony rejecting this standard. (Ex. A, Decl. Cantor ¶ 122; Ex. B, Decl. Laidlaw ¶ 233).

***The Statute Provides for Tapering-Off of Hormones.*** Second, Plaintiffs have not shown irreparable injury because under Idaho Code § 18-8901, prisoners will be tapered off cross-sex hormones—not cut off immediately. Accordingly, Plaintiffs cannot meet their burden of showing irreparable injury.

For any prisoner already receiving hormones for treatment of gender dysphoria—whether already in IDOC's custody or arriving in custody after July 1—Idaho Code § 18-8901 allows doctors to prescribe hormones during a medically appropriate tapering-off period, to avoid health risks that could result from a sudden stop.

This conclusion rests on two provisions of § 18-8901. First, the statute applies only to treatments performed "for purposes of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex." Idaho Code § 18-8901(2).

Because doctors during a tapering-off period prescribe hormones to prevent physical health risks and not to affirm the prisoner's perception of his or her sex, this section does not apply to those prescriptions.

Second, one of the "exempted surgical operations or medical interventions" covers treatments that are

> [n]ecessary to the health of the person on whom it is performed … except that a surgical operation or medical intervention is never necessary to the health of the minor or adult on whom it is performed if it is for the purpose of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex … .

Idaho Code § 18-8901(1)(a). This exemption leads to the same result: hormone prescriptions during a tapering-off period are permitted so long as they are "necessary" for a prisoner's health and not prescribed for the purpose of altering a prisoner's appearance and changing the prisoner's perception of his or her sex.

Plaintiffs ignore these provisions. Plaintiffs' expert, Dr. Ettner, states, "[T]he potential risks of harms are more severe here than in most cases because Idaho's law contemplates cutting prisoners off of treatment regardless of medical need." (Decl. Ettner; Doc. 2-5 ¶ 60). This is false. As described above, § 18-8901 does not cut off treatment regardless of medical need. Furthermore, Dr. Ettner is not a medical doctor. She is not an endocrinologist, and she has not personally evaluated any of the Plaintiffs. Her assertions about the "predictable and dire" consequences of implementing H.B. 668 should be given no weight. (Ex. B, Decl. Laidlaw ¶¶ 281-95).

The actual medical science points to a reasonable and responsible approach to treating Plaintiffs' gender dysphoria in compliance with § 18-8901. The statute does not ban all treatment of gender dysphoria, as Dr. Ettner claims. Rather, the statute prohibits only the risky, experimental surgical and hormonal sex-change procedures outlined in section § 18-1506C(3) of the Idaho Code. The full range of therapy, psychiatric, and other medically accepted methods of treating mental illness, including gender dysphoria, remain available to Plaintiffs. (Ex. B, Decl. Laidlaw ¶ 295).

Moreover, Dr. Ettner is wrong when describing the physiological consequences of transitioning patients off hormone treatments, a subject clearly outside her qualifications. Her warnings of the "severe physiologic consequences" of taking Plaintiffs off cross-sex hormones make for a sensational story, but they are indeed fiction. (*Id*. ¶¶ 281-86). The reality is that tapering gender dysphoric patients off cross-sex hormones happens all the time. The legions of so-called de-transitioners have shown the path. Dr. Ettner's failure to even acknowledge this obviously relevant data is stunning. Dr. Michael Laidlaw, an endocrinologist with the relevant qualifications and experience, describes the familiar process of tapering patients off hormones. His description—based on medical science, relevant experience, and basic biology—offers a more grounded approach whereby Plaintiffs would go through a tapering-off period to transition them off cross-sex hormones. (*Id* ¶¶ 290-94). This process is safe, feasible, and leads to medically safe outcomes, not "irreparable injury."

As demonstrated above, this Court has before it no credible medical evidence of irreparable harm to Plaintiffs caused by the implementation of the statute. Nor does the Court have any evidence from a medical doctor who has personally evaluated Plaintiffs. What the Court is left with are the declarations of Plaintiffs themselves, which are not competent evidence of medical necessity.

### III. Conditional Class Certification Is Not Appropriate

Plaintiffs want this Court to grant "provisional" class certification to present and future prisoners that could be affected by § 18-8901. (Mem. Supp. Mot. TRO; Doc. 2-1 at 15-20; Compl.; Doc. 1 at ¶ 15). It is unclear what "provisional" class certification even is, but what is not unclear is their aim is to get universal relief for prisoners on a preliminary injunction. The Court should decline for many reasons.

***First***, the Supreme Court just "reminded" courts not to "sidestep the traditional equitable rule that the relief a federal court may issue 'must be limited to the inadequacy that produced the injury in fact that the plaintiff has established.'" *Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (cleaned up) (quoting *Gill v. Whitford*, 585 U.S. 48, 68 (2018)). That is effectively what Plaintiffs are after here. They tried to extract that relief by withholding their identities from Defendants and leveraging the Court's TRO order with a demand that Defendants not enforce § 18-8901 as to any inmates. And they also want the Court to give them that relief through their "provisional" (read, premature) motion for class certification. The same reasons the Supreme Court put a stop to overbroad injunctions counsel against provisional certification here: courts should avoid the "fast and furious business" early and broad

injunctive relief that is devoid of "methodically develop[ed] arguments and evidence" and that forces "the affected government … to seek immediate relief from one court and then the next, with the finish line in [the Supreme Court.]" *Id.* at 927. Declining premature certification decisions on an underdeveloped record does not mean that class-wide injunctive relief is never appropriate. It just means the Court takes the Supreme Court's admonition seriously and wisely avoids hastily enjoining state law.

  ***Second***, "provisional" certification isn't a Rule 23 option. Some district courts in the Ninth Circuit have tried to make it a thing, *see, e.g., Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. 2017), but certification is not supposed to be provisional. A court's decision must be supported with a "rigorous analysis," and "actual, not presumed, conformance with Rule 23(a) remains indispensable." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (cleaned up). Thus, certification is anything but a temporary or stopgap measure. In fact, Rule 23 was amended in 2003 to remove a court's ability to "conditionally" certify a class. 3 Newberg and Rubenstein on Class Actions § 7:33 (6th ed.). There is good reason that no other circuit has endorsed the type of "provisional" certification Plaintiffs seek here. Regardless, the Court need not sort out how it could possibly "provisionally" certify a class without improperly "conditionally" certifying it. The record in *this* case is far too premature for the Court conduct the required "rigorous analysis" and ensure that "actual" conformance with Rule 23 is met.

  ***Third***, the PLRA requires prisoners to exhaust their administrative remedies individually before filing suit in federal court. As this Court has recognized, "[t]here

is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Veenstra v. Little*, No. 1:21-CV-00341-DCN, 2021 WL 5544921, at *1-2 (D. Idaho Oct. 20, 2021) (quoting *Jones v. Bock*, 549 U.S. 199, 211 (2007)). But Plaintiffs attempt to circumvent that mandate through a provisional certification decision of a class of prisoners who have not grieved or exhausted their claims. While some courts have borrowed from the Title VII context to create a doctrine known as "vicarious exhaustion," *see Chandler v. Crosby*, 379 F.3d 1278, 1287 (11th Cir. 2004), as far as the State Defendants can tell, the Ninth Circuit has not waived the PLRA's exhaustion requirements. Nor has this Court. Indeed, in *Veenstra*, this Court rejected a similar argument that exhaustion by some plaintiffs was sufficient for all plaintiffs. *Veenstra,* No. 1:21-CV-00341-DCN, 2021 WL 5544921, at *2 ("It does not matter whether exhaustion by some Plaintiffs would have been redundant or futile."). And if *named* plaintiffs cannot bypass the PLRA's exhaustion mandate, neither can non-named, class-member plaintiffs. Plaintiffs have not addressed any of this, and the Court needn't decide that question without briefing.

**And fourth**, Plaintiffs have not even established the basic Rule 23(a) prerequisites. They bear the burden of establishing each of the four Rule 23(a) requirements, and they haven't supported their certification motion with sufficient (and for certain requirements, any) evidence. Their cursory three-page argument also doesn't cut it. On this deficiency alone, Plaintiffs' certification should be denied.

***Pure Speculation on Numerosity.*** Plaintiffs say they have identified at least 24 putative class members. (Memo. Supp. Mot. TRO; Doc. 2-1 at 18). The only support

they have is two Plaintiffs baldly asserting in their declarations that they are "familiar" with, or "aware" of, other inmates receiving hormone therapy. (Decl. Roe; Doc. 2-2 ¶ 25; Decl. Doe; Doc. 2-3 ¶ 22). That is nothing more pure speculation. And "[m]ere speculation as to the number of class members—even if such speculation is 'a bet worth making'—cannot support a finding of numerosity." *See Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 357 (3d Cir. 2013). Plaintiffs do not claim to have access to any inmate medical records. They present no competent evidence that any of the people they claim to have identified are actually impacted by § 18-8901 or even still incarcerated at an IDOC facility. Nor have they bothered to explain to the Court how they are "familiar" with or "aware" of these other inmates. Even if they did offer a common-sense basis for their estimate, this Court requires "[a] higher level of proof than mere common sense impression or extrapolation from cursory allegations." *Paul v. WinCo Foods, Inc.*, 2007 WL 1381794, at *2 (D. Idaho Feb. 16, 2007), *report and recommendation adopted sub nom. Paul v. Winco Holdings, Inc.*, 2007 WL 1366512 (D. Idaho Mar. 29, 2007).

That is not to say that Plaintiffs need an exact headcount to satisfy the numerosity requirement. *See Perez-Olano v. Gonzalez*, 248 F.R.D. 248, 256 (C.D. Cal. 2008). But "mere speculation as to the number of parties involved is insufficient." *Id. see also Roe v. Town of Highland*, 909 F.2d 1097, 1100 n.4 (7th Cir. 1990) ("The party supporting the class cannot rely on conclusory allegations that joinder is impractical or on speculation as to the size of the class in order to prove numerosity."). As it stands, the Court has no basis to make a finding on numerosity. That alone is fatal.

***Psychiatric Conditions Defeat Commonality and Typicality.*** Plaintiffs' Eighth Amendment claim depends on the Court finding that prison officials acted with "deliberate indifference to [their] serious medical needs." *See Estelle*, 429 U.S. at 104. That subjective standard is notoriously fact- and inmate-specific. Plaintiffs assume that because § 18-8901 applies across-the-board, commonality is met. But prison officials applying a state law equally to all does not mean that all inmates who are impacted by the law have suffered an Eighth Amendment injury. In other words, Plaintiffs' proposed class—and any class that could be drawn—is going to require individual inquiries into whether class members' desire for cross-sex hormones or sex reassignment surgery is necessary given their unique medical conditions. Without that inquiry, Plaintiffs cannot demonstrate that all class members have suffered the "same injury." *See Dukes*, 564 U.S. at 349-50.

***Zero Evidence of Adequacy.*** Plaintiffs whiff completely on Rule 23(a)(4). Adequacy is no less a prerequisite than any of the other three Rule 23(a) requirements, and Plaintiffs' motion does not devote a single word to it. Without argument or evidence in support of adequacy, the Court cannot grant certification.

***The Court Cannot Conduct a Rule 23(g) Analysis.*** Even if Plaintiffs had established Rule 23(a) prerequisites, the Court would still not be able to grant certification because Plaintiffs have made it impossible for the Court to appoint class counsel. Pursuant to Rule 23(g), "a court that certifies a class *must* appoint class counsel" and "*must* consider" four conjunctive factors. There is, however, no evidence

in the record that would allow the Court to consider Rule 23(g)'s four mandatory factors. Without an ability to appoint class counsel, the Court cannot certify any class.

For all these reasons, even if the Court were to provide Plaintiffs with injunctive relief, any such relief should be confined to the Plaintiffs themselves, and not a putative class.

## Conclusion

For the foregoing reasons, State Defendants request that the Court deny Plaintiffs' Motion for Temporary Restraining Order, Class Certification, and Preliminary Injunction. State Defendants further request that the Court provide all other relief that is just.[1]

DATED: July 5, 2024

                                            STATE OF IDAHO
                                            OFFICE OF THE ATTORNEY GENERAL

                                            By:   /s/ James J. Simeri
                                                    JAMES J. SIMERI
                                                    Deputy Attorney General

---

[1] State Defendants have not been served with the complaint and have not had an opportunity to respond to the allegations or assert affirmative defenses. Given the emergency nature of Plaintiffs' motion and the Court's order on briefing and hearing, State Defendants file this response without waiving any defenses.

## **CERTIFICATE OF SERVICE**

I CERTIFY that on July 5, 2024, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which sent a Notice of Electronic Filing to the following persons:

Paul Carlos Southwick
psouthwick@acluidaho.org

Emily Myrei Croston
ecroston@acluidaho.org

Malita Picasso*
mpicasso@aclu.org

Chase B. Strangio*
cstrangio@aclu.org

*Attorneys for Plaintiff*
**motion for pro hac vice pending*

Christina M. Hesse
cmh@dukeevett.com

Michael J. Benltey
*mbentley@bradley.com*

*Attorney for Defendants Centurion of Idaho, LLC and Centurion Health*

        /s/ James J. Simeri
        JAMES J. SIMERI