```
 1                    REPORTER'S RECORD
                    VOLUME 2 OF 2 VOLUMES
 2            TRIAL COURT CAUSE NO. D-1-GN-23-003616

 3   LAZARO LOE, individually and   ) IN THE DISTRICT COURT
     as parent and next friend of   )
 4   LUNA LOE, a minor; MARY MOE    )
     and MATTHEW, individually      )
 5   and as parent and next         )
     friends of MAEVE MOE, a        )
 6   minor; NORA NOE,               )
     individually and as parent     )
 7   and next friend of NATHAN      )
     NOE, a minor; SARAH SOE and    )
 8   STEVEN SOE, individually and   )
     as next friends of SAMANTHA    )
 9   SOE, a minor; GINA GOE,        )
     individually and as parent     )
10   and next friend of GRAYSON     )
     GOE, a minor; PFLAG, INC.;     )
11   RICHARD OGDEN ROBERTS III,     )
     M.D., on behalf of himself     )
12   and his patients; DAVID L.     )
     PAUL, M.D., on behalf of       ) TRAVIS COUNTY, TEXAS
13   himself and his patients;      )
     PATRICK W. O'MALLEY, M.D.,     )
14   on behalf of himself and his   )
     patients; and AMERICAN         )
15   ASSOCIATION OF PHYSICIANS      )
     FOR HUMAN RIGHTS, INC. d/b/a   )
16   GLMA; HEALTH PROFESSIONALS     )
     ADVANCING LGBTQ+ EQUALITY,     )
17                                  )
     v.                             )
18                                  )
     THE STATE OF TEXAS; OFFICE     )
19   OF THE ATTORNEY GENERAL OF     )
     TEXAS; JOHN SCOTT, in his      )
20   official capacity as           )
     Provisional Attorney           )
21   General; TEXAS MEDICAL         )
     BOARD; and TEXAS HEALTH AND    )
22   HUMAN SERVICES COMMISSION      ) 201ST JUDICIAL DISTRICT

23        --------------------------------------------------

24          HEARING ON APPLICATION FOR TEMPORARY INJUNCTION
                       AND PLEA TO THE JURISDICTION
25
          --------------------------------------------------
```

1  systematic reviews that covered them -- the systematic
2  reviews that covered them, which in turn cited them, but
3  I couldn't tell you by name.  I couldn't cite the study
4  off the top of my head -- such studies off the top of my
5  head.
6      Q.   Isn't it true actually that all of the studies
7  concluded in some form that the provision of
8  gender-affirming medical treatment showed beneficial or
9  positive effects for the adolescents treated?
10     A.   Those were different studies.  Some of the
11 studies, as I say, were investigating the harms with
12 regard to specific physical parameters, and other
13 studies -- other studies tried looking at the benefits,
14 usually the mental health benefits.  And the ones that
15 looked at harms, again, the objective physiological
16 parameters were indeed able to document the decreases in
17 physical health, and it's the studies that were trying
18 to look for potential benefits that were looking -- the
19 mental health parameters, which some claimed and some
20 did not claim that there were benefits.  So I'm not --
21 as I say, I'm not exactly sure which study you're
22 referring to.  The studies of harms are usually distinct
23 from the studies of benefits.
24     Q.   Sure.  Dr. Cantor, I'm asking about what
25 studies you're referring to because you never mentioned

1  any particular study, so I'm asking.
2       A.   No, I cited the studies quite thoroughly in my
3  report.  I'm just pointing out that I can't recall their
4  names off the top of my head.  If you're asking me to
5  refer to my report to name them, I can do that.
6       Q.   Sure.  The cohort studies that you discussed
7  pertaining to the mental health benefits for seeking to
8  assess mental health benefits or efficacy of the
9  provision of medical treatment for gender dysphoria in
10 adolescents, these studies fall within the middle of the
11 so-called ubiquitous pyramid of evidence that you
12 discussed; is that right?
13      A.   Yes.  They're cohort studies.
14      Q.   Is it your testimony that cross-sectional
15 peer-reviewed studies based on survey data are not valid
16 forms of evidence?
17      A.   Not for outcomes of interventions, no.
18      Q.   Dr. Cantor, you support the provision of
19 medical treatment for gender dysphoria in adults; is
20 that correct?
21      A.   That is correct.
22      Q.   The evidence pertaining to the provision of
23 medical treatment for gender dysphoria in adults is of
24 the same kind and level of evidence pertaining to the
25 provision of medical treatment for gender dysphoria in

```
 1  adolescents; is that right?
 2       A.   It's of the same kind, but when the
 3  interventions are aimed at an adult body, the risks are
 4  lower.
 5       Q.   You do not dispute that there are medical
 6  treatments that are provided to adolescents for which
 7  there are no randomized controlled trials?
 8       A.   Such -- such interventions exist, yes.  Again,
 9  the basic decision-making process is risk to benefit.
10  So when there is a low-risk intervention, then we --
11  then it's permissible or it's legitimate to employ only
12  low-quality evidence of benefit.  But when it's a high
13  risk of harm, such as sterilizing --
14       Q.   Dr. Cantor --
15       A.   -- a child --
16            THE COURT:  Hold on.
17            MR. GONZALEZ-PAGAN:  I'm on limited time.
18  I'm going to object --
19            THE COURT:  Yeah.  So Dr. Cantor, your
20  attorney will have a chance to ask things in more
21  detail, so if you could just stick to what
22  Mr. Gonzalez-Pagan -- they're worried about time.  They
23  only have a certain amount of time, each side.  So if
24  you can concentrate on just his question and answer
25  that.
```