Page 1

```
 1              IN THE COURT OF COMMON PLEAS
 2                  FRANKLIN COUNTY, OHIO
 3                        *   *   *
 4      MADELINE MOE, et al.,
 5           Plaintiffs,
                                         Case No.
 6        VS                           24 CV 002481
 7      DAVE YOST, et al.,
 8           Defendants.
 9                        *   *   *
10              Deposition of JAMES CANTOR,
11      PhD, Witness herein, called by the
12      Plaintiffs for cross-examination pursuant to
13      the Rules of Civil Procedure, taken before
14      me, Donald Correll, a Notary Public in and
15      for the State of Ohio, conducted via a
16      Veritext Virtual deposition, on Thursday,
17      the 20th day of June 2024, at 9:02 a.m.
18
19
20
21
22
23
24
25
```

Page 126

1    Q.  Sure.  And so but you characterize
2 that as a zero-risk intervention, not
3 comparable to medical interference with healthy
4 tissue, right?
5    A.  Yes.  Well, as an example of the
6 kind of recommendation for which one has only
7 low-quality evidence.
8    Q.  But to the extent someone followed
9 that recommendation and did provide
10 pharmacotherapy for obesity, there would be
11 some risk to that intervention?
12    A.  Yes.  Which is why that, as I
13 said, why that recommendation is that such an
14 intervention be done, again, only in -- the
15 recommendation, as I read it, is not for
16 engaging in the medicalized interventions.
17 It's that, even when one does engage in those
18 interventions, it's done as a last resort and
19 in combination with the behavioral and
20 lifestyle issues.
21        Again, to say that a person
22 battling with obesity should receive the
23 psychosocial supports for better exercise and
24 better diet, and so again that's not -- that's
25 a kind of a recommendation which is so

Page 127

1 uncomparable in its risk and potential downside
2 that it's just not comparable to the kind of
3 situation where Dr. Antommaria was saying that
4 it's equivalent to low-quality evidence for
5 biologically interfering with objectively
6 healthy organs.
7    Q.  You support the provision of
8 medical treatment for gender dysphoria in
9 adults in some circumstances, correct?
10    A.  Yes, I do.  I'm hesitating on the
11 word support, only because I don't mean to make
12 it an advocacy position, but support in the
13 sense that I'm perfectly able and willing to
14 have a history of pointing out how that's
15 consistent with the science.
16    Q.  Do you recall providing testimony
17 at a hearing in Loe V. Texas?
18    A.  Vaguely, yes.
19    Q.  Well, were you retained as an
20 expert by the State of Texas in their defense
21 of SB 14, their ban on gender-affirming care
22 for transgender adolescents?
23    A.  I believe I was.  I would have to,
24 of course, you know, check my notes for the
25 exact numbers, but that sounds roughly correct.

Page 128

1        (Thereupon, Exhibit 4, Loe V.
2 Texas Testimony, was marked for identification
3 purposes.)
4 BY MR. SELDIN:
5    Q.  I'll share my screen.  I'll
6 represent to you that this has been pre-marked
7 as Exhibit 4.  It's a copy of your testimony in
8 Loe V. Texas.  I'm on Page 126.  You were asked
9 on Line 18, Dr. Cantor, you support the
10 provision of medical treatment for gender
11 dysphoria in adults; is that correct?
12        And you answered, that is correct.
13        Did you see that there?
14    A.  Yes, I do.  As I say, my answer
15 today was a bit more fulsome, but that's
16 essentially consistent.
17    Q.  So your testimony in Loe V. Texas
18 was accurate?
19    A.  Well, as I say, the first time I'm
20 presented with a question, I give it the
21 accurate response that first comes to mind.
22 And then after being presented with the same
23 question a couple of times, I provide more
24 detail.  But, yes, it's all accurate and
25 consistent.

Page 129

1    Q.  And still true?
2    A.  And it's still true.  And again,
3 in the same way where I -- my only hesitation
4 is so as not to cross into advocacy.  And that
5 in the details, as I'm always pointing out,
6 that what's consistent with the science.
7    Q.  And so you would agree that there
8 is some research demonstrating the
9 effectiveness of gender-affirming medical care
10 for adults with gender dysphoria?
11    A.  Some, yes.  I would hesitate to
12 boil it down quite so simply, because again
13 there are several factors involved.  Not the
14 least of which is that in being an adult, one
15 has already lived a substantial part of one's
16 life as one's biological gender.  One is not
17 merely imagining what one's adulthood will be
18 like.  One by then can compare more directly
19 one's adulthood in one sex versus what one
20 hopes it will be as the other.
21    Q.  So would you agree that it's true
22 for adults that gender-affirming medical care
23 was supported by clinical studies?
24    A.  As best as was available, yes.
25 And again, given the alternatives and given the