Paul Carlos Southwick (ISB No. 12439)
Emily Myrei Croston (ISB No. 12389)
ACLU of Idaho Foundation
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
psouthwick@acluidaho.org
ecroston@acluidaho.org

Malita Picasso*
Chase B. Strangio*
Leslie Cooper**
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
cstrangio@aclu.org
mpicasso@aclu.org
lcooper@aclu.org

*Admitted *pro hac vice*
**Motion for *pro hac vice* forthcoming

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **KATIE ROBINSON, ROSE MILLS**,<br><br>    *Plaintiffs*,<br><br>              v.<br><br>**RAÚL LABRADOR**, in his official capacity as Attorney General of the State of Idaho; **BRAD LITTLE,** in his official capacity as Governor of the State of Idaho**, JOSH TEWALT** in his official capacity as the Director of the Idaho Department of Corrections; **BREE DERRICK** in her official capacity as the Deputy Director of IDOC; **Centurion of Idaho, LLC**; **Centurion, LLC,**<br><br>    *Defendants*. | Case No. 1:24-cv-00306-DCN<br><br>**AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

Plaintiffs Katie Robinson, known by her married name, Katie Heredia, and Rose Mills ("Plaintiffs"), by and through their attorneys, bring this action on their own behalf and on behalf of a class of those similarly situated pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure, and allege as follows:

## INTRODUCTION

1. Plaintiffs and the class they represent are people currently incarcerated in the custody of the Idaho Department of Corrections ("IDOC"). Plaintiffs have all been diagnosed with gender dysphoria, a serious medical condition characterized by clinically significant distress resulting from the incongruence between a person's gender identity and sex designated at birth. Plaintiffs, and those similarly situated to them, face the imminent loss of their health care because Idaho state law mandates an across-the-board ban on their necessary medical treatment.

2. IDOC recognizes gender dysphoria as a serious medical need.

3. For years, IDOC has had a formal internal directive governing the treatment of gender dysphoria, which anticipates treatment with hormone therapy based on individual medical need.

4. Plaintiffs have all been prescribed and are provided hormone replacement therapy to treat their diagnosed gender dysphoria by a clinician acting on behalf of IDOC, Centurion, LLC, and Centurion of Idaho, LLC ("Centurion").

5. Plaintiffs' gender dysphoria has improved because of their hormone therapy, and they have experienced no adverse side effects warranting a change or discontinuation in their treatment plans for medical reasons.

6. As a result of House Bill 668 ("HB 668"), on or about June 13, 2024, medical staff employed by IDOC and/or Centurion notified class members in the Idaho State

Correctional Institution ("ISCI") that their hormone replacement therapy would be terminated or their dose would be lowered in preparation for HB 668's effective date of July 1, 2024.

7.  Upon information and belief, Defendants directed that, because of HB 668, Plaintiffs, and those similarly situated, would have all hormone therapy to treat gender dysphoria terminated beginning July 1, 2024.

8.  IDOC contracts with Centurion to provide medical care for prisoners in state custody.

9.  IDOC is responsible for ensuring that medical care is provided to incarcerated individuals in accordance with constitutional standards.

10.  Defendants' withdrawal, denial, and/or reduction of medications prescribed to treat plaintiffs' serious medical needs based on a blanket ban and without any individualized medical determination, violates the Eighth Amendment to the U.S. Constitution's prohibition on cruel and unusual punishment.

11.  Plaintiffs seek injunctive and declaratory relief to remediate Defendants' violations of their rights and preserve their access to their gender-affirming medical care.

## JURISDICTION AND VENUE

12.  Plaintiffs bring this suit pursuant to 42 U.S.C. § 1983 and the Eighth Amendment to the U.S. Constitution. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1341. Plaintiffs seek declaratory and injunctive relief for Defendants' violation of Plaintiffs' civil rights.

13.  Venue is appropriate in the District of Idaho pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the claim occurred in this District.

**PARTIES**

I. **Class of Incarcerated Persons**

14. Plaintiffs bring this action on their own behalf and on behalf of a class of those similarly situated pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

15. The class is defined as: all incarcerated persons in the custody of IDOC who are, or will be, diagnosed with gender dysphoria, and are receiving, or would receive, hormone therapy proscribed by HB 668.

16. As defined, the class meets all the requirements of Rule 23(a).

17. The class is so numerous that joinder of all members is impracticable. Between 60-70 patients in IDOC custody have been diagnosed with gender dysphoria. Prior to July 1, 2024, 54 of those patients were receiving hormone therapy as a treatment for their gender dysphoria diagnosis. At least 54 incarcerated people in IDOC facilities will, if HB 668 takes effect, lose access to hormone therapy as of July 1, 2024.

18. IDOC operates nine state-owned prisons and five community reentry centers. Additional class members are likely to be incarcerated in those facilities.

19. Additional class members will become incarcerated in the custody of IDOC in the future. If HB 668 is permitted to take effect, they will not receive gender-affirming medical care even if they have a diagnosis of gender dysphoria and a recognized need for this care. Regardless of need, treatment will be denied because of Defendants' enforcement of the blanket ban on treatment in HB 668.

20. There are questions of law or fact common to the class. If Defendants are permitted to enforce HB 668, all members of the class will be subject to a common harm: the cessation of their gender-affirming hormone therapy and/or inability to obtain gender-affirming

hormone therapy that is necessary to treat their gender dysphoria. All members seek the same relief: an injunction preventing enforcement of HB 668's categorical prohibition against the use of state funds and facilities to provide hormone therapy to treat gender dysphoria, as applied to incarcerated people in IDOC custody. This lawsuit also presents common questions of law, including whether Defendants' enforcement of HB 668, as applied to incarcerated people in IDOC custody, violates the Eighth Amendment's protections against cruel and unusual punishment.

21. Plaintiffs' claims are typical of those of the class. They are all transgender incarcerated persons who have been, or would be, diagnosed by IDOC with gender dysphoria and who Defendants are treating, and would treat, with gender-affirming hormone therapy if it were not prohibited by HB 668.

22. Plaintiffs are adequate representatives of the class. They do not have conflicts with other members of the class, they seek the same relief as other members of the class, and they will represent the class fairly and adequately.

23. The class representatives are also adequately represented by counsel. Counsel includes the American Civil Liberties Union Foundation and the American Civil Liberties Union Foundation of Idaho. Counsel have extensive experience litigating class actions in federal court, including civil rights lawsuits on behalf of transgender persons and incarcerated persons.

24. The requirements of Rule 23(b)(2) are met in that Defendants have acted, or will act, on grounds generally applicable to the class, and final injunctive relief and corresponding declaratory relief are appropriate respecting the class as a whole. After HB 668 was enacted, medical staff employed by IDOC and/or Centurion notified the Plaintiffs that their gender-affirming hormone therapy would be immediately discontinued, or reduced and ultimately discontinued, on or before HB 668's effective date. The Attorney General of the State of Idaho

has authority to bring legal action to enforce HB 668. *See* HB 668 § 2(7); Idaho Code § 67-1401(7). The Idaho Governor has the sole duty and authority to terminate the IDOC Director for violations of HB 668. *See* I.C. §§ 18-5702(5), 67-802(2), 67-2404(2). IDOC and the other Defendants will similarly enforce and/or follow HB 668's blanket prohibition on gender-affirming medical care at IDOC facilities absent an injunction.

## II.     Named Plaintiffs

25.     *Plaintiff Katie Heredia* is a transgender woman currently incarcerated Idaho State Correctional Center ("ISCC"). She has been incarcerated since 2014 and anticipates being incarcerated until March of 2033.

26.     Ms. Heredia arrived in an IDOC facility, ISCI, for the first time in 2014.

27.     Beginning at a very young age Ms. Heredia began to recognize herself and identify as a girl. She has gone by her typically female name since she was 12 or 13 years old. While she was still in the Reception and Diagnostic Unit at intake to ISCI, an IDOC clinician, or clinician contracted by IDOC, who specialized in gender dysphoria told her that she could be formally evaluated for gender dysphoria.

28.     Ms. Heredia was diagnosed by this clinician and her diagnosis of gender dysphoria was approved by IDOC.

29.     Ms. Heredia has presented in a typically feminine manner while in IDOC custody.

30.     IDOC and/or Centurion or those under their direct control have prescribed hormone therapy to treat Ms. Heredia's gender dysphoria since 2015. Since 2017, when she was moved to ISCC, she has been under the care of another doctor acting on behalf of IDOC and/or Centurion whom she sees about once a year.

31.     Ms. Heredia has her blood work taken about every 90 days to check her hormone levels. She currently receives estradiol (estrogen therapy) and spironolactone, which blocks male

sex hormone receptors to lower the amount of testosterone the body makes.

32. Ms. Heredia's hormone therapy has given her hope for a better life and a better future. It has reduced her clinical symptoms of gender dysphoria.

33. Hormone therapy has greatly improved Ms. Heredia's health and well-being.

34. Ms. Heredia first learned that HB 668 may affect her gender affirming medical care when she saw a couple of legislators discussing it on KTVB News. It is her understanding that because of this new law, she will be cut off from her hormone replacement therapy if it is permitted to take effect.

35. Ms. Heredia was told by medical staff within the prison that they would not be able to provide her with any medical treatment for her gender dysphoria once HB 668 took effect on July 1, 2024.

36. Staff employed by Defendants administer Ms. Heredia's hormone therapy orally twice a day (morning and evening).

37. If she is cut off from her medication it would be emotionally and physically devastating for Ms. Heredia. Her body would experience extreme hormone dysregulation, she will have psychological effects from her hormone imbalance, and will experience irreparable damage to the feminization she has been able to achieve after being on hormone therapy for a decade.

38. Losing the effects of hormone therapy will cause Katie Heredia severe and irreparable harm.

39. Plaintiff Heredia is familiar with at least nine other people who are treated with gender-affirming hormone therapy for gender dysphoria in ISCC alone. She is also familiar with

an additional at least fourteen people who have been diagnosed with gender dysphoria and are awaiting treatment or are awaiting assessment for a diagnosis of gender dysphoria.

40. *Plaintiff Rose Mills* is a transgender woman.

41. Ms. Mills was incarcerated at ISCI as of June 28, 2024. She has been incarcerated since April of 2023 and anticipates being incarcerated until 2025.

42. Ms. Mills has identified as a woman since she was 23 years old, and has lived as a woman since 2017.

43. When she was arrested in 2019, Ms. Mills was sent to North Idaho Correctional Institution ("NICI"). While there, she asked to be evaluated for gender dysphoria. She was diagnosed with gender dysphoria by a physician at the facility.

44. Ms. Mills began hormone therapy that year and has continued this course of treatment for the past five years.

45. Under the care and supervision of medical personnel, she currently takes estradiol (estrogen therapy) and spironolactone, which blocks male sex hormone receptors to lower the amount of testosterone the body makes. She receives blood work every six months and meets with her doctor yearly to monitor the hormone therapy.

46. On May 28, 2024, she learned about HB 668 and its potential impact on her medication. It is her understanding that because of this new law, she will be cut off from her medical treatment if the law is permitted to take effect.

47. On June 13, 2024, Ms. Mills was told by members of the medical staff that she would be tapered off her hormone therapy medications beginning July 1, 2024. The same day, a memo was sent to her and, she believes, another 15 transgender people at ISCI who receive hormone replacement therapy to treat their diagnosed gender dysphoria. The memo asked them to gather for a meeting the following week to discuss the changes in ISCI's ability to provide gender

affirming medical care.

48.     At the June 20, 2024 meeting, the Warden, Head of Security, and Head of Medical told the transgender people that, due to HB 668, they would either be cut off or tapered off their hormone therapy.

49.     Ms. Mills is concerned for how losing access to the hormone therapy treatment for her gender dysphoria will impact her. Before she was incarcerated in 2023, she suffered a lapse in her hormone therapy due to not having a means of transportation. During that time, she was mentally unstable. Ms. Mills suffered increased anxiety and depression. Her body went through male puberty again and her dysphoria increased. She found it hard to sleep. While the changes in her body upon starting hormone therapy were gradual, after temporarily stopping, the changes came much more quickly and she felt mentally and physically exhausted. She felt alternately cold, clammy, and hot and suffered pain and depression.

50.     IDOC staff administer Ms. Mills's hormone therapy orally twice a day (morning and evening).

51.     She does not want to suffer the pain of losing access to this medical care again. If she is denied access to her hormone therapy treatment, she would be scared for herself. She fears she would suffer the same suicidality and severe mental pain and suffering as she did before.

### III.  **Defendants**

52.     Defendant RAÚL LABRADOR is the Attorney General of the State of Idaho. Idaho law grants Defendant Labrador authority to bring legal action to enforce HB 668. *See* HB 668 § 2(7); Idaho Code § 67-1401(7). Defendant Labrador is sued in his official capacity.

53.     Defendant BRAD LITTLE is the Governor of the State of Idaho. Governor Brad Little signed HB 668 into law on March 27, 2024. Section 5 of the Idaho Constitution vests the

governor with "supreme executive power" and tasks the governor with responsibility for ensuring all State laws are faithfully executed. Defendant Little has the sole authority to terminate the IDOC Director. *See* I.C. §§ 18-5702(5), 67-802(2), 67-2404(2). HB 668 charges Defendant Little with enforcing HB 668 through his power to terminate the IDOC Director if he were to authorize the provision of gender-affirming medical care in violation of HB 668's prohibition. *See* HB 668 § 2(7) (incorporating I.C. §18-5702(5) by reference), I.C. § 20241A(6). Defendant Little is sued in his official capacity.

54. Defendant JOSH TEWALT is the current Director of IDOC. IDOC is the State agency responsible for incarceration of adult inmates sentenced by the courts. IDOC operates nine adult correctional facilities in Idaho, including Idaho State Correctional Center ("ISCC"), Idaho State Correctional Institution ("ICSI") and Pocatello Women's Correctional Center ("PWCC") where Plaintiffs are housed. As Director, Defendant Tewalt is the highest-level official in IDOC and is responsible for administering and overseeing the operations of IDOC, including the policies, procedures, and practices followed by IDOC, its contractors, employees, and agents. On information and belief, Defendant Tewalt is also the final reviewer for treatment decisions by IDOC's Management and Treatment Committee. Defendant Tewalt is sued in his official capacity.

55. Defendant BREE DERRICK is the current Deputy Director of IDOC. As Deputy Director, Defendant Derrick is a member of IDOC's executive leadership team and is specifically charged by IDOC policy with overseeing implementation of health care services and treatment in IDOC including the development and implementation of standard operating procedures to effectuate health care delivery. *See* Board of Correction IDAPA Rule Number 401. Defendant Derrick is sued in her official capacity.

56. On information and belief, Defendant Centurion of Idaho, LLC is a private limited

liability company organized under the laws of Idaho that is contracted to provide healthcare, including medical and mental health treatment services, to inmates in the custody of IDOC, including Plaintiffs. As IDOC's contract medical provider, Centurion of Idaho, LLC is responsible for ensuring that proper medical, dental, psychiatric, and psychological services, and treatment are provided to inmates in IDOC's custody.

57. Defendant Centurion, LLC, is a private corporation headquartered in Virginia and is the parent entity of Centurion of Idaho, LLC. Together with its subsidiary, Centurion, LLC provides healthcare, including medical and mental health treatment services, to inmates in the custody of IDOC, including Plaintiffs. Upon information and belief, Centurion, LLC directly employs healthcare providers responsible for ensuring that proper medical, dental, psychiatric, and psychological services, and treatment are provided to inmates incarcerated under IDOC's jurisdiction.

58. At all times relevant herein, each Defendant was acting in the course and scope of his or her employment and under color of state law.

## FACTUAL ALLEGATIONS

<u>Gender Dysphoria is a Serious Medical Condition Requiring Treatment</u>

59. "Gender identity" is a person's internal sense of belonging to a particular gender.

60. "Gender dysphoria" is the diagnosis for the clinically significant distress that can result from the incongruity between one's gender identity and the sex they were designated at birth. It is a treatable condition recognized by the American Psychiatric Association and included in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, as well as the International Classification of Diseases-10 (World Health Organization).

61. Without treatment, the clinically significant distress caused by gender dysphoria can impair one's ability to function in everyday life.

11

62. Gender dysphoria is highly treatable and with appropriate treatment, individuals can fully manage the symptoms of their gender dysphoria. When not properly treated, however, gender dysphoria is often associated with dangerous related conditions such as depression, substance abuse, self-mutilation, suicidal ideation, and suicide.

Treatment for Gender Dysphoria

63. The World Professional Association for Transgender Health ("WPATH") is the leading international organization focused on transgender health care. WPATH has 4,500 members throughout the world including physicians, psychiatrists, psychologists, social workers, surgeons, and other health professionals who specialize in the diagnosis and treatment of gender dysphoria. WPATH publishes the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("Standards of Care" or "SOC"), which were first developed in 1979. The current version of the Standards of Care, Version 8, was published in September 2022. WPATH's Standards of Care provide clinical guidance to mental health providers and medical professionals treating gender dysphoria.

64. The Endocrine Society, which is the leading professional organization of endocrinologists in the United States, also publishes clinical guidelines for the endocrine treatment of gender dysphoria. Those guidelines, which are entitled Endocrine Treatment of Gender Dysphoric/Gender Incongruent Persons: An Endocrine Society Clinical Practice Guideline ("Endocrine Society Guideline").

65. The WPATH SOC and Endocrine Society Guideline are recognized as authoritative clinical practice guidelines for the treatment of gender dysphoria by every major medical and mental health professional organization in the country, including the American Medical Association, the American Psychiatric Association and the American Psychological Association.

66. Plaintiffs have received gender affirming hormone therapy from an endocrinologist contracted through Centurion in accordance with these accepted medical protocols.

67. Under the WPATH Standards of Care and Endocrine Society Guideline, once there is a diagnosis of gender dysphoria, treatment decisions are made based on the individual needs of the patient.

68. For almost all people with persistent and well-documented gender dysphoria, hormone therapy is an essential and medically necessary treatment to alleviate the intractable distress caused by the condition.

69. The goals of hormone therapy for people with gender dysphoria are: (i) to significantly reduce hormone production associated with the person's sex assigned at birth and, thereby, the secondary sex characteristics of the individual's sex assigned at birth; and (ii) to replace circulating sex hormones associated with the person's sex assigned at birth with feminizing or masculinizing hormones, using the principles of hormone replacement treatment developed for hypogonadal patients (i.e., non-transgender males born with insufficient testosterone or non-transgender females born with insufficient estrogen).

70. The therapeutic effects of hormone therapy are twofold: (i) with endocrine treatment, the patient acquires congruent sex characteristics; and (ii) hormones act directly on the brain, via receptor sites for sex steroids, which produces an attenuation of dysphoria and attendant psychiatric symptoms, and the promotion of a sense of well-being.

71. For transgender women who have undergone orchiectomy (surgical removal of the testicles), hormone therapy must be maintained at therapeutic levels to avoid additional adverse health effects.

72. The safety and efficacy of hormone therapy to treat gender dysphoria are well-documented in decades of research and clinical experience.

73. Psychotherapy and psychotropic medications are not a substitute for hormone therapy to treat gender dysphoria.

<u>Incarcerated People with Gender Dysphoria are Entitled to Access Medically Necessary Treatment for their Dysphoria, Including Hormone Therapy</u>

74. It is the policy of IDOC and its contractors to provide "proper medical, dental, psychiatric and psychological services, and treatment" to incarcerated persons. IDOC Policy 401.

75. IDOC recognizes that, for some people, hormone therapy is medically necessary to treat their gender dysphoria. Under IDOC's Gender Dysphoria Policy, 401.06.03.501, "Hormone replacement therapy will be provided as needed, but only when medically indicated and consistent with the inmate's treatment plan. An inmate who was receiving hormone replacement therapy at the time of incarceration will continue on those medications, unless current treating medical providers determine there is a medically compelling reason to discontinue treatment."

76. Consistent with IDOC policy, prior to HB 668, IDOC and/or Centurion providers treating inmates with gender dysphoria would make an individualized assessment and would prescribe hormone therapy based on medical need. Pursuant to IDOC Policy, IDOC and/or Centurion have determined that Plaintiffs, and putative class members who receive hormone therapy to treat their gender dysphoria, have a medical necessity to receive this care.

77. The clinical guidelines outlined in the WPATH Standards of Care and the Endocrine Society Guideline apply to institutional settings, including prisons. Institutionalized persons on appropriate gender-affirming hormone therapy should be continued on such therapies and monitored, according to these guidelines. Denying hormone therapy to treat gender dysphoria in prisoners with a known need for that care causes severe and expected harms including worsening symptoms of gender dysphoria, anxiety, suicidality, and acts of self-injury.

78. Withdrawing hormone therapy from people who rely on that therapy to treat gender dysphoria causes severe mental distress as well as immediate physical side effects.

79.     Abruptly withdrawing hormone therapy can lead to headaches, hot flashes, and even heart attack or stroke due to spikes in blood pressure.

The Idaho State Legislature Passed HB668

80.     In March 2024, the Idaho State Legislature passed HB 668, prohibiting the use of public funds or public facilities to provide gender-affirming hormone therapy "for purposes of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex." HB 668 §§ 2, 5-6. Governor Brad Little signed HB 668 into law on March 27, 2024. *See* I.C. § 18-8901.

81.     Upon information and belief, IDOC policy, which has been in place for over twenty years, has permitted the use of hormone therapy to treat gender dysphoria. Consequently, HB 668, if permitted to take effect, would upend a policy that has been in place and relied upon by incarcerated people for over twenty years.

82.     Not only does HB 668 categorically prohibit the use of public funds or public facilities to provide any gender-affirming medical care, regardless of the individual needs of the patient, it also criminalizes the provision of gender-affirming care. Intentional violations of HB 668 by public officers or public employees are considered a misuse of public monies, a crime punishable by a fine of up to $10,000, imprisonment of not less than one year nor more than fourteen years, and mandatory termination of employment. I.C. §§ 18-5702(3), (5). Therefore, if HB 668 takes effect, any IDOC employee, Centurion employee working as an agent of IDOC, or any other health care specialist or professional contracted with IDOC or Centurion, who in any way provides gender-affirming medical care is subject to prosecution by Defendant Labrador. Additionally, as IDOC Director, Defendant Tewalt is subject to mandatory termination by Defendant Little.

83.     HB 668 is part of a slew of laws enacted in Idaho over the past few years that

intentionally limit legal protections and rights for the state's transgender community. *See, e.g.*, HB 71 (criminalizing gender-affirming medical care as to transgender youth); HB 421 (erasing transgender individuals from recognition in all state laws, policies and regulations by restricting the terms sex and gender to mean only sex assigned at birth); SB 1100 (restricting access to school facilities); HB 668 prohibiting public funds for gender-affirming medical care as to Medicaid recipients (in addition to incarcerated people).

84. On June 3, 2024, counsel for Plaintiffs sent a demand letter to counsel for IDOC and Centurion, and to the Idaho Attorney General's Office, explaining that enforcing HB 668 in state prisons would violate the Eighth Amendment rights of prisoners in IDOC custody and requesting information about the enforcement of HB 668 and its potential immediate impact on individuals in the custody of IDOC who currently rely on hormone therapy to treat diagnosed gender dysphoria. Counsel for Plaintiffs warned counsel for these Defendants of the grave consequences incarcerated individuals would experience if they began enforcing HB 668.

85. IDOC replied on June 10, 2024 that the agency was discussing the possible impact of HB 668 on individuals in its custody and control but had not decided how HB 668 would be implemented at IDOC facilities.

86. On June 17, counsel for Plaintiffs sent the Attorney General's Office and counsel for Centurion a correspondence requesting a short-term non-enforcement agreement to prevent immediate harm to incarcerated individuals.

87. On June 21, counsel for the parties participated in a video call to discuss a potential non-enforcement agreement. On June 26, the Attorney General's office and counsel for Centurion informed counsel for Plaintiffs that they would not agree to a period of non-enforcement and that enforcement would begin on July 1, 2024.

## CLAIM FOR RELIEF

## Denial of Necessary Medical Treatment (8th Amendment; 42 U.S.C. § 1983)

*Against ALL Defendants*

88. Plaintiffs repeat and reallege the allegations in all preceding paragraphs as if fully set forth herein.

89. Plaintiffs have been diagnosed with the serious medical condition of gender dysphoria, which continues to cause Plaintiffs serious clinical distress and, which, without necessary treatment, will predictably result in serious and irreparable physical and psychological harm to Plaintiffs.

90. Plaintiffs have been prescribed hormone therapy to treat their gender dysphoria while incarcerated. That hormone therapy has relieved their symptoms of gender dysphoria.

91. Defendants are responsible for providing adequate and necessary medical treatment to Plaintiffs, including treatment for persons diagnosed with gender dysphoria.

92. HB 668 establishes a blanket prohibition that denies necessary medical treatment to Plaintiffs and all other similarly situated prisoners in IDOC facilities without consideration of any individualized medical judgment formed by health care providers, and therefore violates the Eighth Amendment's prohibition on cruel and unusual punishments.

93. If HB 668 is permitted to take effect, Defendants will discontinue Plaintiffs' hormone therapy.

94. If Defendants begin enforcing HB 668 as applied to Plaintiffs and thereby denying them medical treatment for their gender dysphoria, they will cause Plaintiffs harm by withholding effective treatment for an objectively serious medical condition.

95. Defendants' intended deliberate action of denying needed medical treatment for Plaintiffs will cause them severe physical and psychological harm and would put them at grave risk

for worsening physical and psychological symptoms.

96. Defendants have acted, and intend to continue to act, with deliberate indifference to Plaintiffs' serious medical needs, and to the substantial risk of serious harm to Plaintiffs.

97. As a result of Defendants' actions described herein, in the absence of injunctive relief, Plaintiffs will suffer irreparable physical and psychological harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgement in their favor and against Defendants as follows:

a. For permanent injunctive and declaratory relief, including but not limited to enjoining Defendants, including their contractors, employees, and agents, from enforcing HB 668 as applied to Plaintiffs and Class members incarcerated in the custody and control of IDOC; enjoining Defendants, their contractors, employees, and agents, to provide and continue providing Plaintiffs and Class members gender-affirming hormone therapy, in accordance with nationally recognized standards for delivery of such care; and declaring unconstitutional Defendants' practices in denying Plaintiffs and Class Members adequate and necessary medical treatment;

b. Certification of the Class;

c. For reasonable costs of this suit and attorneys' fees and expenses; and

d. For such further relief as the Court may deem just, proper, and appropriate.

///

September 30, 2024

Respectfully submitted,

<u>/s/ Emily Myrei Croston</u>

Attorney for Plaintiffs